### No. 7866.

### EUGSTER & CO. vs. JOSEPH WEST & CO.

The rule, that no damages can be recovered for the inexecution of a contract when its non-performance was prevented by a fortuitous event or irresistible force, has two exceptions, one of which is when there has been some fault of the party contracting which preceded the fortuitous event, and without which the loss would not have happened; and the other when he has expressly or impliedly taken the risk of such event or force.

The non-performance of a contract for the delivery of corn is not excused by a freeze of a river, when it may be executed in another way than that first in the contemplation of the parties. If the freezing of a river be a fortuitous event, it is the duty of the party contracting to provide other means of transportation, and especially is this so when he is warned of the impending freeze, and knows the necessity of the party with whom he has contracted to have the corn delivered for reshipment.

When the circumstances shew that the term was fixed in favor of the creditor, and the contract was made to enable him to fill another engagement by a stipulated time, the debtor or party contracting waits until the last day of the term at his peril, and takes the risk of weather changes which impede the execution of the contract in the manner least onerous to himself. A contract can be passively violated by not doing what was covenanted to be done at the time and in the manner implied from the nature of the contract.

APPEAL from the Fifth District Court for the Parish of Orleans. *Rogers*, J.

*Blanc & Butler* for Plaintiffs and Appellants.

*Singleton & Browne* for Defendants and Appellees.

The opinion of the Court was delivered by

MANNING, J. Eugster & Co. bought 50,000 bushels of corn on December 14, 1878, from the defendants who contracted to ship it from the Ohio river within twenty days from the date of purchase, and to deliver at New Orleans alongside ship. Plaintiffs bought the corn for shipment to Europe, and had chartered the steamship Minnie Irwin in Europe to carry the cargo. The defendants failed to ship the corn from the Ohio river within twenty days from the date of the contract. It was not shipped until the latter part of January, 1879, and not delivered to the Minnie Irwin at New Orleans until February 8 following.

That ship arrived at that port early in January and her lay days expired on 20th of that month, from which day she was entitled to demurrage at the rate of £30 sterling per day. The delay was prolonged until her demurrage was swelled to £600, or twenty-nine hundred and twenty-eight dollars in our currency, which the plaintiffs were compelled to pay.

This suit is for the recovery of that sum from the defendants.

They admit that they agreed to ship the corn from Mount Vernon on the Ohio river within twenty days from the date of their contract, but aver that the shipment was to be by the steam tug Garrett and barges, and that such shipment and any shipment was prevented by the freezing of the Ohio river on or about December 22, by reason whereof that river was closed to navigation. They allege that the corn was at Mount Vernon within the twenty days ready for shipment, and would have been shipped within that time but for the suspension of navigation, which suspension lasted until about January 25th, when the tug proceeded to Mount Vernon, took the corn in her barges, and delivered it at New Orleans as soon thereafter as was possible.

They claim to be discharged from liability by the freezing of the river which they insist was a fortuitous event.

The testimony satisfactorily shews that the shipment by the tug Garrett was not stipulated in the contract, and formed no part thereof. It was not material to the plaintiffs by what boats the corn was transported down the river, and if the defendants' allegation be true that no boat whatever could then navigate it, it should seem unimportant to their defense, if it be good in other respects, whether the transportation was to be by a particular tug or not. Is then the defendants' non-compliance with their contract excused by the Code under the circumstances of this case on the ground alleged by them?

Where by a fortuitous event or irresistible force the debtor is hindered from giving or doing what he has contracted to give or to do, or is from the same causes compelled to do what the contract bound him not to do, no damages can be recovered for the inexecution of the contract.

There are two exceptions to this rule: 1st, when the party in default has by his contract expressly or impliedly undertaken the risk of the fortuitous event, or of the irresistible force; 2d, if the fortuitous event, or case of force, was preceded by some fault of the debtor, without which the loss would not have happened. Rev. Civil Code, Art. 1933, paragraphs 2 and 3.

The Code defines a fortuitous event to be that which happens by a cause which we cannot resist, and those accidents are said to be caused by superior force which human prudence can neither foresee

nor prevent, Art. 3556. The *Pandectes Francaises* teach that *on entend par cas fortuits les accidens qu'on n'a pu ni prévoir ni empêcher.* So Emerigon on Insurances, 285, by accident (cas fortuit) is meant a superior force which cannot be foreseen nor resisted. In its legal sense, fortuitous event is synonymous with " act of God " in the common law. It is not imperative in this case to say whether or not the freezing of the Ohio river in mid-winter is a fortuitous event as defined by the Code. It would seem such an event might reasonably be expected in that latitude at that time—that it was probable and seasonable.

The proof is that the cold set in about December 20th, and attracted Eugster's notice, who expressed to the defendants his apprehensions of a freeze, warned them of the danger, and urged them to forward the corn. Prados, a member of the defendant firm, did not share this apprehension because the river was very full and, as he said, could not freeze then, however intense the cold. The river did freeze on the 25th, and navigation was not resumed until January 15th. For eleven days after the contract was made the river was unobstructed, and the corn could have been shipped without hindrance. A steam tug and barge left a point on the river opposite Mount Vernon as late as the eleventh day. The defendants neglected to ship—indeed made no effort to ship—while the river was in this favorable condition, and thus committed a fault, thereby coming within the terms of one of the exceptions just cited from the Code.

But they are equally within the terms of the other exception. They were to deliver the corn from the Ohio river between December 14th and January 3d, the season when severe cold is usual, and a frozen river an event that might be foreseen. It was a contingency so probable and so seasonable that it ought to have entered into their calculation of the time for the execution of the contract, and no doubt would, but for their confidence in the impossibility of its occurrence in the then stage of the river. In either case they must be presumed to have contracted with reference to it. The assumption of the risk of the freeze is implied from the nature of the contract and the time and manner of its execution. If then we concede the principle that the defendants' counsel contend for, and admit, nay even decide, that the freezing of the river is a fortuitous event within the meaning of the Code, the defendants are expressly excluded from immunity from liability for damages for the inexecution of their contract, by the qualifications which the Code makes of the rule they invoke.

The modifications of that rule, which are a part of Art. 1933, seem to have escaped the notice of the counsel. They quote the rule in their

brief alone, and ignore the exceptions, which have such important bearing on the case.

But was it a fault to have failed to ship within eleven days when the contract expressly stipulated twenty? The defendants claim they had the full term in which to ship, and could wait if they pleased until sunset of the last day. Rev. Civ. Code, Art. 2057. A contract may be passively violated by not doing what was covenanted to be done at the time, or in the manner implied from the nature of the contract, as well as that stipulated in it. *Idem*, Art. 1931. If the defendants had shipped on the last day of the term, they would doubtless have pleaded that as a literal fulfillment of their contract, with what success it is needless to inquire, but when they chose to wait until that time, with the impending danger of a freeze of the river in mid-winter, they must be held to have taken the risk of such occurrence. It was implied from the nature of the contract, and the time and manner of its execution.

The term is always presumed to be in favor of the debtor unless it result from the stipulation, or from circumstances that it was also agreed upon in favor of the creditor. *Idem*, Art. 2053. The circumstances of this case shew that the term was fixed with reference to the plaintiffs' need to have the corn here to meet the ship ordered from Europe. She reached this port about January 4th, but was not entitled to demurrage until the 20th. Had the shipment been made as prudence, and a due regard to the probability of obstruction to navigation by ice demanded, the corn would have reached here before the demurrage began. The defendants were guilty of negligence and want of proper forecast, and these are expressly stated by Mr. Story to entail liability for losses occasioned by the identical event occurring in this case. 2 Contracts, § 752 c..

In enumerating the causes which would relieve a freighter from liability for demurrage on the one hand, and impose that liability on him on the other hand, a writer on this special subject lays down rules supported by authorities, among which are these: The freighter does not become liable to further demurrage if, after having sailed, the ship be driven back to port by adverse winds and be by them detained, as for instance by frost or bad weather. * * * But the freighter is not excused from the payment of demurrage for not loading or unloading the vessel within the lay-days because the port of loading, or the river by which the goods were to be conveyed to that port, was frozen up. 1 Kay's Shipmasters and Seamen, 154-5.

So where peas were shipped from Canada to be carried to New York, but owing to the carrier's neglect and inexcusable delay they were stopped on the way by the freezing of the lakes, and the carrier refused

to transport them by rail, it was held that damages were recoverable. Field's Law of Damages, § 386.

There cannot be any doubt if the defendants had not persisted in the attempt to ship by the tug Garrett and barges and in no other way, the corn could and would have been delivered before the demurrage began, notwithstanding the freeze. The fact that that tug and her barges belonged to them explains their persistence, but does not excuse it. Mr. Parsons states the rule to be—the non-performance of a contract is not excused by the act of God where it may be substantially carried into effect, although the act of God makes a literal and precise performance of it impossible. 2 Contracts, 185. So in a case where a defendant had contracted to carry a man from New York to San Francisco, that part of the voyage from San Juan del Sur to be made in a particular vessel, which was lost, it was held—if the loss or wrecking of the vessel was the act of God, it was the duty of the defendant to exercise diligence in providing another vessel for the carriage of the plaintiff. He was bound to use all the means, in endeavoring to supply another vessel, which a diligent, careful man exercises in his own affairs. The main thing the defendant agreed to do was to carry the plaintiff from New York to San Francisco. His promise to carry him in a particular vessel from San Juan del Sur to the latter place was a minor part of the contract. Williams vs. Vanderbilt, 28 N. Y. 217.

The defendants' counsel admit the force of these authorities in the common law, but deny their applicability, because the rights of parties in this case must be determined by our own law, to-wit: Art. 1933 of the Code. We readily grant it. It could not be otherwise. But the whole of that Article is our law, and not a part only. The modifications of the rule relax and temper it, and are equally binding with it. It is significant that the corresponding Article of the Napoleon Code has not the important modifications that have been added to our own. It reads thus:

Il n'y a lieu à aucuns dommages et interêts lorsque, par suite d'une force majeure ou d'un cas fortuit, le debiteur à été empêché de donner ou de faire ce à quoi il etait obligé, ou a fait ce qui lui etait interdit. Code Nap. Art. 1148.

It cannot reasonably be doubted that the rule of the French law was modified in the redaction of our Code with the purpose of bringing it more in accord with that system from which we derive our commercial law, and the authorities from the common law we have cited therefore derive additional force from that circumstance. They are thus made safe guides in construing the provision of our Code upon the subject in hand.

But the counsel for the defendants insist that the decisions of this

Court sustain their interpretation of this Article of our Code, and cite four cases as apposite and conclusive. It is needful therefore that these be examined critically that their real import and force be ascertained.

The first is White vs. Kearney, 9 Rob. 495, where there was a con-tract for the delivery of lime, the discussion in the opinion being of features of the case wholly disconnected with that of time, and upon that, the Court merely remarking, " the fact of the vessel not clearing on or before the day stipulated, we do not consider of much importance as it was not necessary, when it was evident she could not go to sea. The clearance could be effected in a very short time, the proposed voyage being a coasting one, and the cargo consisting of one article consigned to the same persons, to-wit: the defendants." The vessel was ready to go to sea on the day stipulated, and was prevented by adverse winds, but the Court considered that unimportant, as the clearance could be made in a very short time, and the voyage being a coasting one with but one article in cargo, deliverable at the end of the voyage, there was no delay *en route*, and therefore the loss did not ensue in consequence of not sailing on a given day.

The next is Police Jury vs. Taylor, 2 Ann. 272, which was a suit on a bond to keep a bridge in good and safe condition for five years. The bridge was carried away by a freshet within that time, and the defen-dant pleaded it as a fortuitous event and irresistible force. The Court say : " whether the freshet was an irresistible force is a matter of con-jecture. The witnesses think it was not, and that the bridge might have been built so as to withstand it. Freshets seem to be of frequent occurrence on that river." There was judgment against the defendant for the amount of the bond.

In that case, as in the case at bar, the question whether the freshet or the freeze was a fortuitous event, or an irresistible force is pretermitted, but freshets being of frequent occurrence on the river in that case, and freezes in this, the decision is manifestly authority for the construction of the law we now make.

In Lagrave vs. Fowler, 4 Ann. 243, marble buildings were to be finished by a specified time, but the quarry was inundated by the floods of the Mississippi and Missouri rivers. The materials were delivered after the term and the defendant accepted them, and the court held him bound to pay for them because he accepted them. This is the language : " the condition of time became impossible, and the defen-dant, by permitting the plaintiffs to furnish their labor and materials afterwards, bound himself to pay for them."

The last case is Bietry vs. New Orleans, 22 Ann. 149, where the plaintiff contracted to fill the batture in front of a part of the City, and

was prevented by high water from completing it by the time specified. Held : if overpowering force or unusual high water prevented the completion of the work within the term, the contractor was entitled to pay for so much as he had done.

We do not think these cases sustain the interpretation of our law claimed by the defendants' counsel.

The defendants did not attempt to provide any other means of transportation than their own tug and barges. They were confident of the inability of the elements to create the very obstruction which, not without warning, was interposed, and distrusted and disbelieved the possibility of the freeze, and refused and neglected to use such means as were, or might have been at hand, to make the shipment in time to avoid the hindrance, or to surmount it. Through their non-fulfillment of their obligation, the plaintiffs suffered loss in fulfilling theirs.

Judgment affirmed.

## On Application for Rehearing.

In the opinion of the Court heretofore read, we remarked the quotation by the defendants' counsel of a part only of Art. 1933, omitting the exceptions in par. 3 which follow immediately that part of the text quoted. Our decision was based upon those exceptions.

The brief for rehearing reiterates the argument of the first brief— again ignores the vital modifications of the rule, regulating the consequences of the inexecution of a contract because of a fortuitous event or irresistible force, by abstaining from any allusion to them, notwithstanding those modifications are the pivot upon which the case turns— and in the teeth of the unambiguous and positive provision of the Code asserts, "the happening of any fortuitous event, which prevents the performing a contract, shields the party from all damages."

The Code says otherwise. It enacts that a fortuitous event or irresistible force, which prevents the execution of a contract, shall not shield a party from damages, when that party has either expressly or impliedly undertaken the risk of the event or the force; nor shall it shield him if the event or the force was preceded by some fault of his own, without which the loss would not have happened. Rev. Civ. Code, Art. 1933, par. 3.

The brief proceeds:

" The framers of our Code seemed determined that no court should deprive any party, *by construction*, of the benefit of this wise and humane provision of our law ; the absence of which had ruined so many worthy men under the common law system which requires that a party, to have its benefit, must specially stipulate for it in his contract. No

one who has read the common law reports, could have failed to see how often wise, noble and humane judges have been greviously pained by the necessity of enforcing this barbarous provision."

And yet the framers of our Code of 1825 had the hardihood to insert this barbarous provision which until then was unknown to our law. The Code of 1808 did not have it.   The Art. 1148 of the Code Napoleon is literally transcribed in the Code of 1808 without addition or modification, tit. 3, c. 3, sec. 4, art. 48, and is transplanted into our Code of 1825 and forms par. 2 of Art. 1927.   (Art. 1933 of the Revised Code of 1870.)   Then follows par. 3 which, as we observed in our former opinion, was without doubt inserted to bring our law more in conformity to that of other States, and to infuse into the law governing contracts some of the principles of a system which is the outgrowth of the developments of modern trade and enterprise.   It may be deplorable that this contrivance for the ruin of worthy men, the enforcement of which has grievously pained wise, noble, and humane judges, was imported into our Code by the ruthless innovators of 1825, but so long as it remains there, we shall not have to resort to judicial construction to deprive any litigant of fancied rights, which this modification of our law, made near three score years ago, denies him.

The defendants had contracted to ship within twenty days.   Having failed to perform their contract, they were liable for its inexecution unless they established legal excuse.   To say that they were hindered by a "fortuitous event or irresistible force" is not sufficient unless it also appears: 1, that they had not, expressly or impliedly, undertaken the risk; 2, that the event was preceded by no fault on their part contributing to the loss.   The risk of a fortuitous event, so regular and periodical in its character as the freezing of the Ohio river in December, might possibly be considered as impliedly assumed by the obligor in such a contract.

But it is not necessary so to hold in the present case.   When its happening was indicated, and they were expressly warned of the danger, their failure to ship during the ten or eleven days during which it was possible, was a fault which they have not excused under the evidence in this case.   They have not shewn that the corn was not, or might not have been ready for shipment during that time, or that vessels could not have been procured to carry it.   The evidence indicates the contrary.   The admission that the Garrett, and her barges, was the first vessel that got out after the freeze has no bearing.   The question is, could shipment have been made before the freeze?

The rehearing is refused.