(118 So. 485)

No. 27051.

## NEUSS, HESSLEIN & CO. v. LANE COTTON MILLS.

July 20, 1928. Rehearing Denied Oct. 29, 1928.

Lemle, Moreno & Lemle, of New Orleans, for appellant.

Dart & Dart, of New Orleans, for appellee.

BRUNOT, J. Plaintiff is a partnership composed of Edgar J. Hesslein, Eugene Beyer, and John Staudt. The suit is for $116,356.-64, for damages suffered by plaintiff as the result of defendant's alleged breach of three contracts, the first of which called for the delivery, during the time beginning October, 1916, and ending March 30, 1917, of 10,000 pieces of coverts; the second for 10,000 pieces of coverts, of which 2,500 pieces per month were to be delivered during the months of June, July, August, and September, 1917; and the third for 3,000 pieces of denims, of which 1,000 pieces per month were to be delivered during the months of June, July, and August, 1917. It is alleged that partial deliveries were made from time to time under each of said contracts, but no deliveries were made under the second contract during the four months of June, July, August, and September, 1917, and that such deliveries as were made under each of said contracts were far short of the quantity called for by the contracts.

The defendant filed an exception of vagueness and an exception of no cause of action. Both exceptions were heard and overruled, the answer was filed June 4, 1919, and further proceedings in the case were held in abeyance from that time until December 12, 1922, on which date plaintiff filed a supplemental and amended petition. In its answer to the supplemental petition, defendant excepted thereto upon the ground that the original and supplemental petitions contained inconsistent demands; that plaintiff should be ordered to elect; and that the supplemental petition did not set forth a cause of action. These exceptions were referred to the merits, the case was tried, and plaintiff appealed from a judgment rejecting its demands, at its cost.

The innumerable letters and documents offered on the trial show that there is no material disagreement as to the facts of the case. The real contention between counsel is as to the legal consequences of the admitted facts. The trial judge in his reasons for judgment correctly says:

"The court believes that if the rights of plaintiff and defendant are ascertained as of date May 4–6, 1918, it will then be manifest as to whether or not the plaintiff has a standing in court. To arrive at this conclusion, it will be

necessary to briefly state the mutual obligations and rights of the party litigants from the date of the first contract of September 26, 1916.

"This suit is based on the difference between the contract price of these three contracts and the alleged market price of date May 4–6, 1918. The first contract, Exhibit A, dated September 26, 1916, was for 10,000 pieces of coverts to be shipped from October, 1916 to March 30, 1917; that is, the contract should have been completely fulfilled by the 30th of March, 1917. It is well to note that the time of fulfilling the first contract had completely expired before the other two contracts were made. Before taking up these other contracts, let us \* \* \* see what deliveries had been made under the first contract before the expiration of the time mentioned therein. On April 1, 1917, there had been delivered under the contract, which called for 10,000 pieces, an average yardage of 55 to the piece, totaling 550,000 yards, only 2,080 pieces, containing a total yardage of 113,074 yards,—in round figures approximately only one-fifth of the contract. Notwithstanding this fact, on April 10, 1917, without attempting to place the defendant in default, or to buy in the open market, as the plaintiff would have had a right to do and charge the defendant with the difference between the price thus paid and the contract price, the plaintiff entered into two additional contracts.

"Contract No. 2, dated April 10, 1917, was for 10,000 pieces of coverts, to contain between 50 and 60 yards, said coverts to be shipped 2,500 pieces each during the months of June, July, August and September, 1917. Under this contract no shipment was made during the time specified therein. The only shipment ever made under this contract was made on the 13th day of January, 1918, on which date 434 pieces containing 24,483¼ yards were shipped.

"The third contract was on the same date as the second, to wit, April 10, 1917, and called for 3,000 pieces of denims to be shipped 1,000 pieces each June, July and August, 1917. Not a single shipment or delivery under this contract was made during the time specified in the contract, the first shipment being made on the 21st day of January, 1918.

"So in September, 1917, as regards the deliveries under the contracts, the following is a résumé:

"The first contract. Under this contract there had been delivered 6,220 pieces out of a total of 10,000 pieces due, or a total of 320,723 yards delivered out of 550,000 yards called for by the contract. As will be seen, from March 30, 1917, the date on which the time specified in the contract had expired, defendant had delivered under this contract, up to September, 1917, an additional 4,140 pieces containing a total yardage of 207,649, all of these deliveries being made during the months of April, May, June and July, of 1917, the last delivery being made on the 20th of July, 1917.

"The second contract. No deliveries at all.

"The third contract. No deliveries at all.

"The time having expired on all three contracts.

"Certainly it is not claimed that a putting in default was accomplished at this time. On the contrary, very agreeable and solicitous telegrams were exchanged. For example, on September 4th, 1917, plaintiff wired defendant as follows: 'Reference pending orders can you give anything definite when will resume deliveries.' To which telegram defendant answered, on the 7th of September, 1917: 'Answering telegram fourth expect to resume deliveries in about five weeks.' The conclusion is inevitable that plaintiff there and then abandoned any idea of ever enforcing its rights as regards the time in which deliveries should be made under the contracts. They accepted this indefinite promise on the part of the defendant corporation to fill these contracts practically at its own pleasure. The correctness of this conclusion is shown by the interchange of correspondence in December, 1917, three months later. On December 24, 1917, plaintiff wired defendant as follows: 'Your letter 17th, our contract 24468 (third contract), your order 329 Blue Denims, when can we expect goods to begin? How many per week? Wire reply.'

"And on December 28th, defendant wrote plaintiff as follows:

"'Contract 24468. Your letter December 24th. We have advised you by wire that we will be in a position to furnish about 200 pieces commencing about January 10th.

"'We have these goods in work now, and unless nothing unforeseen happens, we should be able to pack from 30 to 35 cases monthly. In view of this, we would thank you to let us have shipping instructions now, so that we can forward these goods promptly when put up.'

"From all of which it is apparent, as above stated, that the thought of insisting upon the performance of these three contracts, in December, 1917, seems never to have entered the mind of the officials of plaintiff corporation. So apparent is this conclusion that plaintiff's counsel almost admit the effect of this correspondence, on page 27 of their brief, and then attempt to escape the annihilating effect of it under the statement that the consent of plaintiff to the postponement of these deliveries was

obtained by fraudulent misrepresentation on the part of defendant. Extract from plaintiff's brief, page 27: 'We have quoted the foregoing correspondence in full in order that your Honor may appreciate that plaintiff at no time consented to the constant postponement of deliveries under the three contracts, but simply refrained from putting defendant in default and purchasing upon the open market, on account of its belief that defendant was really engaged in war work which temporarily rendered impossible the fulfillment of its civilian contracts.'

"This theory is untenable. No fraud is alleged in plaintiff's petition. Secondly, the plaintiff itself was conversant with the entire situation. Its lack of knowledge of pending conditions is negatived by a letter written in July, 1917, as follows:

" 'July 16, 1917.

" 'Lane Cotton Mills, New Orleans, Louisiana.

" 'Gentlemen: We are in receipt of your favor of the 11th instant. We know that the Government is ordering goods, but they do not compel any mill to stop delivering bona fide orders for which they were already engaged. No other mill—although we are dealing with quite a number and they have considerable orders from the Government—has taken the same stand as you, and we must insist that we receive goods right along, to begin immediately or we shall be compelled to take the matter up with the Government.

" 'You owe us goods that were to be delivered as far back as April and May on the old contract, and the new contract calls for 10,000 pieces for June, July, August, so that any goods up to June should not have been interfered with as most of the Government orders started some time the latter part of May or early June.

" 'Very truly yours,

[Signed] Neuss, Hesslein & Co.'

"In view of the foregoing letter, it is impossible for the court to believe that plaintiff's consent was not freely and knowingly given, in September and December, 1917, to the new arrangement between itself and the defendant, which in effect was to accept deliveries when and in what quantity defendant could furnish them. The court believes, therefore, that on May 4-6, when Mr. Odenheimer visited plaintiff in its New York office, that plaintiff had no right whatever, under the three contracts sued upon, to put defendant in default as to deliveries under said contracts at any special time. The language contained in defendant's brief, on page 7, clearly states what the court believes to have been the legal effect of the various negotiations between plaintiff and defendant subsequent to the expiration of the time limit for deliveries contained in the three contracts:

" 'Whether it was better or worse for the contracting parties to stand on their respective rights at the moment was the question they then and there decided. The presumption is that neither party cared to exercise his legal rights, but whatever motive or cause induced the new agreement, it is perfectly clear that defendant engaged to do thereafter only what it promised to do in September and in December 1917 respectively. The past was wiped out, the future was all plaintiff had to look to. Like an amnesty the new agreement had the effect of forgiving and forgetting the conduct of both parties previous to September and December 1917.'

"This suit was filed on November 25, 1918. Since that date there have been several cases decided by the Supreme Court of the State of Louisiana which are very much in point, to wit: Garrison & Son v. Sherrill Hardwood Lumber Co., 156 La. 147, 100 So. 253; Monumental Brewing Co. v. Southern Rice Milling Co., 155 La. 455, 99 So. 401; National Wholesale Grocery Co. v. Simon Rice Milling Co., 152 La. 2, 92 So. 713; Bonsor & Co. v. Simon Rice Milling Co., 151 La. 1094, 92 So. 711.

"In these cases the Supreme Court, with emphasis, stated: 'It would be both unfair and inequitable to allow plaintiff to select a remote date upon a rapidly rising market as the basis of the damages claimed, and the putting defendant in mora on such a date was nugatory and of no effect.'

"Under these decisions, even if plaintiff had not agreed to the new arrangement of September and December 1917, it would not be allowed to select May the 4th or May the 6th as the date on which to so tardily exercise rights which should have been exercised, under the law, many months before.

"The Court believes that plaintiff itself must have realized the difficulty of its position, because four years after the filing of the original petition it filed, on December 12, 1922, a supplemental petition setting up a different measure of damages, claiming, in the alternative, that if it was not entitled to recover for the breach of contracts alleged in its original petition, that the defendant, having used the cotton which it has purchased to fill petitioner's contracts in fulfilling contracts entered into with the United States, petitioner is legally and equitably entitled to recover judgment against the Lane Cotton Mills for the profits made by it on the said government contracts, to wit, the difference between the price to have been paid by plaintiff and the price actually received from the government.

"Such a contention is legally unsound, as the law recognizes no such measure of damages,

and the filing of said petition is merely referred to as a manifestation of plaintiff's consciousness of the weakness of its position.

"Plaintiff's counsel has laid a great deal of stress on the opinion of the Supreme Court in the Eugster Case (35 La. Ann. 119, 48 Am. Rep. 232). The court is of the opinion that this case has no application whatever to the present facts under consideration. In the present case if plaintiff had no right to demand performance of the expired contracts on May 4–6, 1918, the impossibility of performance by defendant on those dates is immaterial. In passing, the court might say that on those dates the evidence shows the defendant, if the contracts were then in force, would have been unable to have fulfilled them due to the government having practically commandeered its mill; and the court further believes that the doctrine in the Eugster Case would not have applied, as there is a great distinction between an expected seasonal event, such as the freezing of a river, and the taking over of a mill by the Government. It might as well be contended that a manufacturer could have foretold the date of the armistice, which occurred some six months later, as to say that he could foresee the commandeering of his mill on any given date. Such foresight is not given to mortals.

"In conclusion, from an examination of all of the correspondence, the evidence and the depositions on file, the court is convinced that the plaintiff itself was not in a position to demand deliveries under the contracts sued upon, and for this reason did not hold the defendant to its contract and did not attempt to enforce its legal rights. The plaintiff corporation is engaged in the exporting business, and it is common knowledge that ship's space from April, 1917 to May, 1918, for commercial purposes, was almost unobtainable. There is some evidence in the record that the name of the plaintiff corporation was included in a list of names furnished to the collector of the port of New Orleans of those to whom an export license should not be issued. As to the effect of this notification, or why it was issued or how long it remained in effect, or whether or not similar lists were sent to the collectors of other ports, the court is not informed. But the court believes that no matter whether or not they were able to export at that period, yet they were not in a position to demand deliveries in strict accordance with their contracts, but willingly agreed to accept these deliveries practically at the pleasure of the defendant.

"For the foregoing reasons, plaintiff's suit is dismissed at its cost."

We have carefully reviewed the record and have read the seven original and supplemental briefs filed by counsel, and have reached the conclusion that the reasons given by the trial judge are sound and that the judgment appealed from is correct.

For these reasons the judgment is affirmed, at appellant's cost.

O'NIELL, C. J. (dissenting). The correspondence that passed between the plaintiff and defendant, in which the plaintiff was demanding a compliance with the contracts, and the defendant was merely offering excuses and making promises, does not convince me that the government's orders made it impossible for the defendant to fulfill the contracts. On the contrary, the defendant solicited and obtained the government contracts because the market value of the goods which the defendant was obligated to deliver to the plaintiff had risen to approximately double the prices stipulated in the contracts. There was nothing in the government contracts which made it impossible for the defendant to carry out the contracts previously made with the plaintiff. The theory on which the district judge founded his judgment—which has been adopted by the majority of the members of this court—seems to be that the plaintiff's acceptance of the goods that were shipped after the time stipulated in the contract, and the failure to put the defendant in default formally and to demand damages for nonperformance of the contract, immediately when the time stipulated for delivery of the goods expired, was an abandonment of the plaintiff's rights under the contracts. I know of no authority for that doctrine, particularly in a case like this, where the plaintiff continuously insisted upon a compliance with the contracts. For these reasons I respectfully dissent from the majority opinion and decree.