(139 So. 638)

## FARNSWORTH v. SEWERAGE & WATER BOARD OF NEW ORLEANS.

### No. 31390.

Jan. 4, 1932.

Rehearing Denied Feb. 1, 1932.

Gus A. Llambias, of New Orleans, for appellant.

Deutsch & Kerrigan, of New Orleans, for appellee.

ODOM, J.

Under contract entered into by these parties, plaintiff obligated himself to build for defendant an extension of drainage pumping station No. 6. Admittedly plaintiff did all the work he was obligated to do under the contract and specifications. But he claims that defendant is yet due him $8,723.84 for items enumerated in his petition, all of which are denied by defendant.

The present suit is for that amount. There was judgment for plaintiff as prayed for, and defendant appealed.

The first item is for removing and hauling 373 cubic yards of earth to build a levee, for which plaintiff claims he should be paid $1.18 per yard, or $440.14.

Section 28 of the specifications provides that the engineer shall determine the amount of excavated material to be removed from the station site as spoil, and section 29 that all excavation ordered removed shall be paid for at the unit price bid for removing excavated material under item No. 6. Section 1 of the specifications contains this, among other provisions: "This work is divided into (6) six items, upon which bids shall be submitted." Then follow the six items, No. 6 being "excavated material removed from site of station."

In plaintiff's proposal attached to the contract and accepted by defendant we find the following:

"Item 6. For excavated material removed from the site of station, assumed quantity 22,000 cubic yards, the sum of one dollar and eighteen cents ($1.18) per cubic yard."

It is admitted that plaintiff was not paid for removing the 373 yards of excavated material used to build the levee, but defendant contends that it owes him nothing for this item because article 30 of the specifications provides that the contractor shall make all excavations required, and that the surplus material shall be deposited to build a levee as shown, or at some point within a radius of 500 feet from the point where excavated.

It is contended by counsel for defendant, and we think correctly so, that under the contract plaintiff was not to be paid extra for the material excavated and deposited on the "site of the station," because that was cov-

ered under another item of the bid. He was to be paid $1.18 per yard for "excavated material removed from the site of the station."

■ Whether this material was removed "from the site of the station" is a question of fact. We think it was removed from the "site of the station."

Mr. Richard Kohnke, who was an employee of defendant, and who supervised the work done by plaintiff, was asked, "Now wasn't that levee built with earth hauled from the site of the contract?" and he answered, "Yes," and further said that it was done in accordance with his instructions. Mr. Farnsworth also stated that the dirt was hauled off the site. Mr. Wood, the engineer, denies this. He said also that plaintiff was not paid for grading this levee, yet in defendant's answer it is stated, paragraph 4, "Defendant admits paying petitioner for grading the levee." Mr. Wood either lacked information or his memory was at fault.

Plaintiff should be paid for this work.

■ Item No. 2 is for extra work done on a levee for which he claims $2,942.69.

After the contract was let, the specifications were revised, and plaintiff was ordered to build the levee higher and to change the slope, which made it more expensive to build.

It is not denied that plaintiff is entitled to some additional remuneration for building this levee, but it is claimed that he did not establish with sufficient certainty the extra amount due. The trial judge thought he did, and we think so too.

■ Item No. 3 is for the rebuilding of a cofferdam which washed away during the construction of the work, for which plaintiff claims $276.78. This item was allowed by the judge, but we think it should have been rejected. During the construction of the work, plaintiff built a cofferdam in front of

the retaining wall of the discharge tube to hold the water out while the retaining wall was being connected with the end of the tube. This cofferdam was in front of a tube which discharged the water pumped by engine No. 4. During the night of March 21, 1930, there was an excessive rainfall, and, in order to dispose of the accumulated water, the engineers in charge of the plant set all the engines, including No. 4 to work, and as a result the cofferdam was washed away.

The complaint which plaintiff makes is that it was not necessary to operate engine No. 4. The engineers thought it was. One of them stated that an emergency existed which made it necessary to operate all the pumps, and that under the circumstances they would have operated them at any cost.

Section 40 of the specifications provides that "during the progress of the work the Sewerage and Water Board must operate the pumps in the station with a view of affecting the best possible conditions of general city drainage and this duty is paramount. * * * The Board obligates itself in no respect to maintain any particular status as to drainage conditions at or near the pumping station during the time that this contract is in process of execution."

Plaintiff, under this provision, assumed the risk of having his works destroyed in case of an emergency. The board is not liable for this item.

Item No. 4 is for extra work done in building a switch track from the Southern Railways tracks to the station. For this plaintiff claims $3,639.23.

The contract called for the building of a switch track "as shown on the plans," and plaintiff made his bid accordingly. Later on, engineers for the railroad inspected the plans, and refused to permit the track to be built

according to the board's specifications, but required that it be built according to specifications drawn by its own engineers, which were drawn and submitted to plaintiff, who promptly notified Mr. Wood, engineer for defendant. Mr. Wood ordered plaintiff to build the switch according to the railroad's specifications. The changing of the specifications made the building of the track more expensive.

Mr. Wood says he approved the new specifications, but did not agree for the board to pay the additional expense.

█ The switch track was necessary, and plaintiff was obligated to build it, but could not build it according to the plans furnished by defendant. The change was agreed to by defendant's engineer, who knew all the circumstances. The change necessitated extra work, which under section 195 of the specifications and article 2764 of the Civil Code must be paid for by defendant. See White v. City of New Orleans, 15 La. Ann. 667.

█ The contract provides that the work should be completed by a certain date, and that in case of delay in the completion of it within the time specified "the contractor agrees to pay as liquidated damages the sum of twenty five dollars ($25.00) per day for each day of such delay, which liquidated damages shall become due by the mere elapsing of the delay without the necessity of putting the contractor in default." Section 189, specifications.

The completion of the work was delayed 57 days, and defendant deducted $25 for each day, or $1,425, from the contract price for this delay.

Plaintiff seeks to recover this amount. He admits the delay, but says it was due partly to the fault of defendant and in part to excessive rains.

He claims that defendant delayed him "some thirty or forty days" by failing to connect discharge outlets with its pumps, 12 days by ordering cofferdams in front of the pump tubes filled with water so that the pumps could be tested, and ordered him not to pump out the water so that he could not proceed with his excavation work, 2 or 3 days by ordering him not to put scaffolding in front of the pumps, 10 days by defendant's negligent destruction of a cofferdam, and that it rained 60 or 70 days.

The testimony of Mr. Farnsworth, and that of Mr. Hath and Mr. Meyer, his employees, is positive, and supports plaintiff's contentions that, due to no fault of his, but due solely to the fault of defendant in failing to do promptly certain things which it was its duty to do, and to instructions to delay the work in order that it might make certain tests, he was delayed more than 57 days.

The defendant conceded that plaintiff was delayed to some extent due to its fault, but contends that he was given credit for those delays.

Mr. Wood, defendant's engineer, was asked if full credit was given plaintiff for whatever delays, if any, "had been caused by matters affecting the Sewerage and Water Board," and he said: "It is my impression that we did; that we allowed him all claims, all claims for delays which were due to the Sewerage and Water Board, and against that, we very frequently allowed him to tear down forms and remove supports from concrete and took chances greater than was contemplated in the contract so as to endeavor to hurry him up." (Page 100 of the record.)

Again he was asked if it were not a fact "that you caused Mr. Farnsworth considerable delay in connecting the discharge outlets with the pumps?" and he answered, "No more than was contemplated in the contract and

we have got to bring in there the question of the fact that Mr. Farnsworth was paid an additional amount to hurry up the work." (Page 119). At page 120 he was asked if he did not order the discharge basin filled with water for the purpose of testing them, and he said, "That is a fact. These discharge tubes were part of his own contract and we were testing them in addition to testing the pumps." At page 121 he was asked if he did not cause some delay by ordering some scaffolding removed from in front of the pumps on the suction side, and he answered, "I don't consider so. This contract provides for his co-operation with other contractors."

Mr. Woods' testimony shows that plaintiff was delayed to some extent at least by his orders. But he contends that these delays were such as should have been contemplated and taken into consideration by the contractor. We do not concur in his opinion in that respect.

He says it is his impression that plaintiff was given credit for all delays which the defendant caused. If he was given any credit at all for delays, it must have been for the reason that he, as engineer for the board, considered that the board was at fault. If plaintiff was given credit for any delays, the number of days' credit should have been deducted from 57 days, the default period. It is alleged in the petition that the default period was 57 days, and the answer admits that defendant deducted $25 "for every day after the time stated when the work should have been completed."

Mr. Wood was the only witness for defendant who seemed to have any knowledge of the delays. His testimony as a whole shows that the board did cause some delay in the progress of the work, but he does not say, in fact he says he cannot say, how many days. On the contrary, the testimony of plaintiff and his witnesses is specific on this point, specifying the number of days, the dates, and the causes. According to their testimony, plaintiff was delayed more than 57 days by defendant. We must therefore accept their version.

■ The testimony further shows that plaintiff was delayed some on account of abnormal flood conditions. These were such, for one period at least, as to constitute a "fortuitous event" or an "act of God." During a 24-hour period in September, 1929, the rainfall was approximately 12 inches. Some of the streets of the city were so flooded that all traffic ceased for a time. On September 8, 1929, one of the local newspapers carried reproductions of photographs showing canoes in the streets, with this inscription above them: "It looks like Venice, but it's New Orleans." Mr. Earl, general superintendent of the sewerage and water board of New Orleans, in his report to the president and members, dated October 12, stated that the rainfall for September was 14.63 inches, or 9.41 inches above normal, and from January to the end of September was 65.76 inches, or 21.05 above the average for 36 years, and that the United States Weather Bureau reported a rainfall for September of 2.67 inches above any previous record for that month since 1871.

■ The precipitation seems to have been abnormal during the greater portion of the 10-month period for the completion of this work. But plaintiff is not entitled to credit for each day it rained or for excessive rains, as that was a risk which he assumed. But floods and inundations caused by abnormal and unprecedented rainfall are generally held to be fortuitous events or an "act of God." See "Act of God" in Words and Phrases, First, Second and Third Series.

There were several days during the term of this contract that it was impossible for

plaintiff to carry on his work on account of the flood.

The law does not penalize a man for his failure to perform a contract when his failure is due to a fortuitous event or irresistible force, an event which human prudence could neither foresee nor prevent.

Eugster & Co. v. Joseph West & Co., 35 La. Ann. 119, 48 Am. Rep. 232; Civ. Code, art. 1933.

In the case of United States v. Gleason, 175 U. S. 588, 20 S. Ct. 228, 233, 44 L. Ed. 284, the government engineers sought to penalize a contractor for his failure to complete his contract on time. In discussing the rules applicable to cases of the kind, the court said: "One is that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless his performance is rendered impossible by the act of God, the law, or the other party."

We conclude, as did the district judge, that plaintiff should recover this amount.

It is therefore ordered and decreed that the judgment appealed from be amended by eliminating item No. 3, $276.78, for rebuilding the cofferdam, and, as amended, it is affirmed, with costs.