140 So.2d 653 (1962)
J. A. HARPER, Plaintiff-Appellee,
v.
The HOME INDEMNITY COMPANY, Defendant-Appellant,
CONCRETE STRUCTURES, INC., Third-Party Defendant-Appellant.
No. 9688.
Court of Appeal of Louisiana, Second Circuit.
April 4, 1962.
Rehearings Denied May 9, 1962.
*655 Gist, Murchison & Gist, Alexandria, for Home Indemnity Co., defendant-appellant.
Stafford & Pitts, Alexandria, for Concrete Structures, Inc., third-party-defendant-appellant.
Thompson, Thompson & Sparks, Monroe, for appellee.
Before HARDY, GLADNEY and AYRES, JJ.
AYRES, Judge.
This is an action by plaintiff, J. A. Harper, a general contractor, against the defendant, The Home Indemnity Company, as surety upon a performance bond executed on behalf of Concrete Structures, Inc., a subcontractor, for reimbursement for loss and damages allegedly sustained by reason of the default, or failure, of the subcontractor to perform the work and render the services constituting the subject matter of a contract entered into by and between plaintiff and the subcontractor. At the instance of the defendant, the subcontractor, Concrete Structures, Inc., was made a third-party defendant against which the defendant sought judgment for such amount as it might be condemned to pay plaintiff. It was also stipulated that defendant recover judgment against the subcontractor, in any event, for the sum of $467.87 as attorney's fees and expenses incurred in the defense of this action.
The principal defense urged to plaintiff's action is twofold: (1) that the contract between Harper and Concrete Structures, Inc., had been dissolved by a resolutory condition, and (2) that the surety had been released from its obligation by extension of the term of the contract through a mutual agreement of the contractor and subcontractor without its knowledge or consent.
There was judgment below in favor of plaintiff against defendant surety for the sum of $2,163.00 with legal interest thereon from judicial demand until paid, together with 10% additional on principal and interest as attorney's fees. A judgment for an identical sum, together with the *656 aforesaid stipulated amount, was rendered in favor of the defendant against the third-party defendant.
The principal sum of the judgment represents the difference between the price for which the subcontractor had agreed to do the work and the amount plaintiff was compelled to pay to a new subcontractor for performance of the same work. Plaintiff's claim for the further sum of $2,606.37 as additional damages for loss and expenses allegedly occasioned by the failure of the subcontractor to perform its contract was rejected. From the judgment thus rendered, the defendant and third-party defendant appealed. Through an answer to this appeal, plaintiff prays that the judgment be amended to include the remainder of his claim.
A decisive issue presented for resolution is whether the contract between plaintiff and the subcontractor continued in effect after November 15, 1958, and until the latter was placed in default. This is largely a factual question, and must be determined by the language of the contract and of the documents referred to or made a part thereof.
The facts deemed material for a consideration of the questions thus presented for resolution may be briefly reviewed. Under date of October 31, 1957, a contract was entered into by and between the Department of Public Works of the State of Louisiana and plaintiff, J. A. Harper, whereby the latter agreed and bound himself, for a recited consideration, to furnish all labor, materials, and equipment, and to do and perform all work required for repairs to Allen Dam on Saline Bayou in Natchitoches and Winn Parishes, Louisiana, in conformity with designated plans and specifications and to the complete and entire satisfaction of the Department of Public Works.
Under date of September 15, 1958, Harper entered into a subcontract with Concrete Structures, Inc., wherein the latter agreed to do a certain specified portion of the work contracted by Harper from the Department of Public Works, described as the gunite repairs to the dam, defined as pneumatically-applied concrete. The execution of this contract was preceded by the issuance of a work order by the Department of Public Works, dated August 19, 1958. Defendant's bond was executed October 21, 1958.
At the time this subcontract was entered into and at the time of the issuance of the work order, or notice to proceed, the jobsite was still under water and continued to be so inundated or flooded due to exceedingly heavy rainfall and flood waters until August, 1959. During this period, the work order was held in suspension by the Department of Public Works, and commencement of the work was prohibited by the Department pursuant to provisions of its contract with Harper.
In support of their contention that the subcontract had terminated by a resolutory condition, defendants rely upon this provision of the subcontract:
"The Subcontractor agrees that the work under this contract is to be begun and provided for immediately, and carried on promptly; and the Subcontractor agrees to complete the work covered by his contract in such time and in such manner that the Contractor may complete all of the work included in its contract with the Owner on or before 15th day of November, 1958. * * *." (Emphasis supplied.)
It is noted that no provision was made in the subcontract for payment of liquidated damages for failure to complete said work in accordance with the aforesaid provision of the contract.
For a continuance of the contract in effect beyond the date specified, as aforesaid, plaintiff relies upon the principal contract between him and the Department of Public Works, which contract, he contends, by the language employed in the subcontract, was effectively made a part of the *657 subcontract. It may, therefore, be pointed out that Article II of the subcontract contains this provision:
"The Subcontractor agrees to be bound to the Contractor by the terms of the Agreement, Surety Bond, General Conditions, Drawings and Specifications for the entire work (which he has examined and read) insofar as they relate in any part or in any way to the work undertaken herein, and to assume towards the Contractor, in connection with the work covered by this contract, all of the obligations and responsibilities which the Contractor by those documents assumes towards the Owners or anyone else. The Subcontractor further agrees not to sublet, assign or transfer this contract or any part thereof without the written consent of the Contractor."
The defendants also rely upon Article XVII of the subcontract for support of their position that the subcontract as written constituted the entire contract. This provision, rather than supporting defendants' position, supports the contention of plaintiff. It reads:
"It is distinctly understood and agreed that there are no agreements or promises made that are not covered by this contract and that this written contract, together with the documents referred to herein, covers all matters pertaining to this particular work." (Emphasis supplied.)
Thus, we conclude that all the provisions of the initial contract have been incorporated into and form a part and portion of the subcontract just as effectively as if fully written and incorporated therein.
Reference may now be made to pertinent provisions of the general contract or of the plans and specifications. The contract contains this provision:
"The work called for herein shall be commenced within twenty (20) calendar days after receipt by CONTRACTOR of notice to proceed, which notice is to be issued by PUBLIC WORKS' Chief Engineer, and completed within seventy-five (75) calendar days after receipt of said notice."
A special provision of the specifications recites:
"The site of the work at Allen Dam shall be dewatered by opening the gates in Allen Dam after construction of an earthen dam on Black Bayou approximately two (2) miles above Allen Dam. This dam shall be constructed by the contractor responsible for the construction of Saline Lake Dam. This earthen dam shall remain in place until all work has been completed under this contract for Repairs to Allen Dam." (Emphasis supplied.)
Contained also in the specifications is this provision:
"The contractor will be required to commence work at the site, under the contract, within twenty (20) calendar days after receipt by him of notice by the Chief Engineer, Department of Public Works, to proceed. He shall prosecute the work with faithfulness and energy and shall complete it within 75 calendar days after the date of receipt by him of notice to proceed."
Moreover, the subcontract provides for an extension under its own terms in the use of this language:

"Should the Subcontractor be delayed in the prosecution or completion of the work by the act, neglect or default of the Owner, the Architect and/or Engineer, or by damage caused by fire or other casualty for which the Subcontractor is not responsible, or by the combined action of the workmen, in no wise caused by, or resulting from default or collusion on the part of the Subcontractor, then the time herein fixed for the completion of the work shall be extended the number of days *658 that said Subcontractor has been thus delayed, but no allowance or extension shall be made unless a claim therefor is presented in writing to the Contractor within forty-eight (48) hours of the occurrence of such delay. No additional compensation in connection with extension of time will be allowed unless specific agreement is made at the time such extension is granted." (Emphasis supplied.)
A provision for an extension of the contract terms is also contained in the specifications attached to the general contract. This provision reads as follows:
"The time within which the work is required to be completed is an essential part of this contract but contractor may submit to the contracting agency an application in writing for extension of the contract time where delay in the progress of the work has been occasioned by the elements or other acts of God, strikes, emergencies occasioned by war or national defense, priorities, orders, rules or regulations imposed by any governmental body or other circumstances which are not foreseeable and are beyond the control of the contractor, and one or more said circumstances has been the proximate cause of the delay. Such application will not be considered by the contracting agency unless it contains a full statement as to how and to what extent the progress of the work was retarded by the circumstance or circumstances alleged to have been the proximate cause of the delay.
"If the contracting agency finds that contractor has been delayed as a result of any of the causes enumerated above, an extension of the contract time will be granted to the extent of such delay. The decision of the contracting agency on any such application shall be final.
"No extension of the contract time will be granted until the written consent of the surety is first obtained." (Emphasis supplied.)
The general contract, together with the plans and specifications attached thereto, and the subcontract must be read and construed together in order to fix the rights and obligations of the parties, and, when so read and construed, it is abundantly clear that the time for the commencement of the contract did not begin until the jobsite had been dewatered sufficiently to permit the performance of the work contracted to be done. This was not until August, 1959, when, for the first time, the Department, through its engineer, directed that the work proceed. The prior work order had been, as stated, held in suspension until that date.
Defendants contend, however, that the specific provision of the subcontract requiring the performance of the work undertaken within such time as the entire work could be completed by November 15, 1958, is controlling. The rule is well established that whenever inconsistencies exist in the language employed in a contract, from the recitals of documents attached thereto, the language of the documents prevails and governs. This principle has been adhered to in a long line of decisions, particularly with reference to deeds in which we discern no difference in character and requirements from the contract now under consideration. Cragin v. Powell et al., 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566; Werk v. Leland University, 155 La. 971, 99 So. 716; Nick v. Bautovich, 119 La. 1039, 44 So. 880; Gray v. Coco, 113 La. 33, 36 So. 878; Lallande v. Wentz & Pochelu, 18 La.Ann. 289; Keay v. New Orleans Canal & Banking Co., 7 La.Ann. 259; Canal Bank v. Copeland, 6 La. 543; South Louisiana Fair Association v. Robert et al., 3 La.App. 505; Flanagan v. Elder, La.App., 90 So.2d 540.
We therefore, conclude that the provisions of the general contract and the documents attached thereto govern and control and, hence, that the contract continued in full force and effect after November 15, 1958.
*659 Moreover, the contention that the contract terminated or was dissolved as of November 15, 1958, appears to be an afterthought. After Harper had given notice to Concrete Structures, Inc., to begin performance of his contract, its secretary-treasurer, with an employee, called upon plaintiff at his office for the purpose of discussing the performance of the contract and obtaining prices on materials. This conference was followed by an inspection of the jobsite to determine what equipment was required to do the work. No contention was made that the contract had been terminated; nor that the subcontractor's obligations had been dissolved by a resolutory condition. It was only after its secretary-treasurer returned to Memphis, where he consulted with his lawyer, that he wrote plaintiff as follows:
"With reference to the work which you contracted with us to do on September 15, 1958 please be advised that under the terms of this contract the completion date was November 15, 1958. Therefore, this contract is no longer in effect.
"We do not choose at this time to engage in another contract for this work."
Contrary to defendant's contention that the subcontractor was not in position in 1959 to do the work, because of having removed its equipment and employees from the vicinity, its secretary-treasurer testified it was prepared to begin the work within 24 hours, had it been obligated to do the work.
Moreover, the rule, where, by a fortuitous event or an irresistible force, an obligor is prevented from doing what he has contracted to do, no damages may be recovered for the inexecution of the contract, is subject to an exception where the obligor has by his contract expressly or impliedly undertaken the risk of the fortuitous event or of the irresistible force. LSA-C.C. Art. 1933(3). The contingency and the likelihood of high water on Saline Bayou and Red River were so probable that such events ought to have entered into the calculations of the subcontractor when entering into the contract, particularly in view of the fact that the jobsite was, at that time, to its knowledge, under water, and that the work could not then be done. Thus, with full knowledge of the facts temporarily retarding the performance of the contract, the subcontractor made the engagement without reservation or exception and agreed to do the work subject to the site's being dewatered by the Department of Public Works through another contractor over which neither of these parties litigant had control. In fact, the subcontractor was, by the contract itself, made aware of the fact that the jobsite was under water and had to be dewatered before the work could be started. Under such circumstances, it must be presumed the parties contracted with reference to that condition, and that the subcontractor assumed the risk involved from the nature of the contract and as to the time and manner of its execution. In Eugster & Company v. Joseph West & Company, 35 La.Ann. 119, is found this appropriate observation:
"They (defendants) were to deliver the corn from the Ohio River between December 14th and January 3rd, the season when severe cold is usual, and a frozen river an event that might be foreseen. It was a contingency so seasonable that it ought to have entered into their calculation of the time for the execution of the contract, and no doubt would, but for their confidence in the impossibility of its occurrence in the then stage of the river. In either case they must be presumed to have contracted with reference to it. The assumption of the risk of the freeze is implied from the nature of the contract and the time and manner of its execution. If then we concede the principle that the defendants' counsel contend for, and admit, may even decide, that the freezing of the river is a fortuitous event within the meaning of the Code, the defendants are expressly *660 excluded from immunity from liability for damages for the inexecution of their contract, by the qualifications which the Code makes of the rule they invoke." (Emphasis and parentheses supplied.)
See, also: Dallas Cooperage & Woodenware Co. v. Creston Hoop Co., 161 La. 1077, 109 So. 844; Farnsworth v. Sewerage & Water Board of New Orleans, 173 La. 1105, 139 So. 638.
Objections to certain testimony predicated upon the assumption that the testimony tended to contradict, alter, or vary the terms of the written contract were made by defendants. We find no merit in the objections. The testimony was sought not for the purpose for which the objections were made but merely to establish the knowledge of the parties concerned of the conditions of the jobsite, not only at the time of the confection of the contract but the continuance of such condition until 1959.
Nor do we find any merit in the contention that the term of the contract was extended without the knowledge or consent of the surety. The delays for the commencement and completion of the work were contingencies provided for in the contract itself, the contents of which the surety had complete knowledge. Any subsequent, expressed agreement would have been entirely superfluous.
To the contrary, the proof establishes no extension agreement was made. The record is completely barren of any agreement to extend the term of the contract. Nor was there any consideration to support such an agreement, in the absence of which there can be no valid extension. O'Banion v. Willis et al., 14 La.App. 638, 129 So. 440. See, also: 50 Am.Jur., p. 946, "Suretyship," § 60.
The conclusion is, therefore, inescapable that, by the very terms of the contract itself, when read in connection with the general contract and the documents attached and which were incorporated into the contract, the contract was in full force and effect subsequent to November 15, 1958, and continued in effect until breached by the subcontractor.
Finally, for consideration, is the question of the amount of damages sustained by plaintiff as a result of the breach of contract by defendant's assured. The measure of damages, where the object of the contract is anything other than the payment of money, is the amount of loss sustained and profit of which one has been deprived. This rule is subject to the qualification that, when the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or as may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. LSA-C.C. Art. 1934. There is no suggestion of bad faith or fraud in this case.
In accordance with this principle, the excess payment by plaintiff for the work contracted clearly constitutes an item of damages within the contemplation of the parties at the time the contract was entered into. We find no error in its allowance.
Another item of damages aggregating $1,006.65 consists of expenses incurred over a period of three weeks, during which time a new subcontractor was being procured and moved to the jobsite. These expenses to maintain a supervisor and pumper on the job were necessary and incurred as a direct result of the failure of the subcontractor to perform its contract. They are, in our opinion, such as may be reasonably supposed to have entered into contemplation of the parties at the time of the contract. Consequently, this portion of the claim should also have been allowed.
After the subcontractor had begun performance of the work and, in fact, only two days before completion of the work contracted by it, high water again compelled *661 a work stoppage. This necessitated another delay of one week. During this period expenses similar in character to the above were incurred in the sum of $506.27.
Also, following completion of the work contracted by the new subcontractor, the jobsite was again flooded. Three weeks' delay in finishing the work resulted. This entailed additional and similar expenses of $1,093.45.
These last items were not, in our opinion, in the contemplation of the parties; nor could they have been reasonably supposed to have entered into their contemplation at the time the contract was entered into. An additional reason exists for their disallowance. The contract made no provision for reimbursement of such expenses had they been occasioned during the performance of the work by the original subcontractor.
Defendant's last contention is that the allowance of attorney's fees of 10% of the principal claim on which recovery was permitted, was error. We find it necessary to refer to only one of the reasons upon which error is claimed. Statute LSA-R.S. 9:3902 provides:
"If the surety on a bond fails to pay his obligation and it becomes necessary for the creditor to sue thereon, the latter shall be entitled to ten per cent attorney's fees on the amount recovered, provided he has employed an attorney for the purpose, has made written amicable demand on the principal and surety and thirty days have elapsed from their receipt thereof without payment being made, and the full amount claimed in the demand is recovered." (Emphasis supplied.)
This statute is penal in character and, for recovery thereunder, strict compliance with its provisions is required. This statute provides that 30 days' written amicable demand must be made upon both principal and surety. The record discloses that written demand was made upon the subcontractor. A copy of that demand was mailed to the surety. This constitutes only notice to the surety that a demand was being made upon the principal. Such notice is insufficient to serve as a demand upon the surety. Hence, the mandatory requirements of the statute were not complied with, and allowance of attorney's fees was error.
Accordingly, the judgment appealed is amended by deleting and eliminating the provision for 10% attorney's fees, and by increasing the award in plaintiff's favor to $3,169.65, and also by increasing the principal award in favor of the defendant to $3,169.65; and, as thus amended, the judgment appealed is affirmed at defendants-appellants' cost.
Amended and affirmed.

On Motion for Rehearing
PER CURIAM.
Plaintiff-appellee, in a motion for rehearing, complains of the failure of the court to award him the statutory attorney's fees. The basis for complaint is our statement in the opinion:
"* * * The record discloses that written demand was made upon the subcontractor. A copy of that demand was mailed to the surety. This constitutes only notice to the surety that a demand was being made upon the principal. Such notice is insufficient to serve as a demand upon the surety. * * *"
An examination of the record discloses that such a demand as described in our original opinion was made upon the principal, Concrete Structures, Inc., by letter dated November 17, 1959, signed by plaintiff and directed to the principal at its street address in Memphis, Tennessee. This letter was not addressed to The Home Indemnity Company; a copy was only forwarded to it.
The letter to which plaintiff refers in his application for rehearing is dated August 27, 1959, and is addressed to both principal *662 and surety. This letter, however, was written prior to the beginning of the work originally contracted and constitutes only a demand that the subcontractor, the principal on the bond, perform the work as contracted, and the letter, thus, serves only to place the subcontractor in default and to give notice to it and the surety of plaintiff's intention to hold both principal and surety to account for any losses which might be sustained as a result of the failure of the subcontractor to comply with the contract and perform the work obligated to be done.
This letter, in our opinion, does not constitute such a demand upon the principal and surety on a bond as contemplated by the statute. LSA-R.S. 9:3902, entitling a recovery of attorney's fees, as the letter relied upon made no demand for the payment of any sum whatsoever.
The aforesaid motion for a rehearing and the motion on behalf of the defendant and third-party defendant are, accordingly, denied.