BARNETTE, Judge.
This is an action arising out of a building contract. The contractor seeks recov *606 ery of the balance alleged due from the owner under the terms of the contract. The owner seeks by way of reconvention against the contractor and by separate suit against the contractor’s surety, recovery of an amount alleged necessary to complete the building and to correct the deficiencies caused by improper workmanship.
On February 9, 1965, Joseph A. Popich, owner of a lot in Buras in Plaquemines Parish, contracted with H. Bennett Fox, a building contractor, to build a residence thereon for the contract price of $43,660. Certain extras were thereafter agreed upon to cost an additional $1,279.17. The contract provided for payments in four installments at respective stages of completion in the amount of $9,823.50 each and a fifth and final installment (not including extras) in the amount of $4,366. The contract completion date was August 13, 1965, with provision for “liquidated damages” of $10 per day for each day thereafter the building remained incomplete. Fidelity and Deposit Company of Maryland, as the contractor’s surety and bonding company, was a party to the contract which contained also the following clause:
“And it is agreed and understood that said surety, in addition to the amount of the foregoing bond/shall be liable for all costs, charges, expenses and attorney’s fees, incurred in any concursus or other legal proceeding made necessary by the failure of the contractor to faithfully comply with the foregoing contract, said attorney’s fees to be fixed at five per cent, on the amount of the foregoing bond.”
The first three installments were paid but Popich withheld payment of the fourth and fifth installments amounting to $14,-189.50 and the $1,279.17 for extras, being a total of $15,468.67. Fox brought suit for this amount.
Popich answered setting forth the defense of incomplete, improper and deficient work. He alleged an estimated cost of $15,626.92 plus $10,000 added by supplemental pleading for completion of the residence; $500 due for certain credits; $1,-512.83 for corrective work already done; liquidated damages for failure of completion by August 13, 1965, 320 days at $10 per day ($3,200); attorney’s fee $2,183— all totaling $33,022.75. This amount he claimed as a set-off and prayed for judgment in that amount in reconvention.
Thereafter Popich filed a separate suit against Fidelity and Deposit Company of Maryland seeking judgment for the same amount and for the specific items respectively alleged owing by the contractor, Fox, except the above item of $500 alleged due for certain credits.
The suits were consolidated for trial. In the first suit, number 9515 on the trial court docket, number 3758 on the docket of this court, there was judgment in favor of the plaintiff, Fox, against Popich for $15,468.67, the exact amount claimed by Fox. Neither the judgment nor the “Reasons for Judgments” makes any reference to the conventional demand. Popich appealed suspensively.
In the suit of Popich against the statutory bondsman, Fidelity and Deposit, number 9779 on the trial court docket and number 3757 on the docket of this court, there was judgment in favor of Popich, plaintiff, against Fidelity and Deposit Company of Maryland in the amount of $8,135. Fidelity and Deposit appealed suspensively. Po-pich answered the appeal in this court seeking an increase, including $500 for expert witness fees. He contends a net balance of $11,901.50 plus interest is due him after set-off of the acknowledged amount due Fox.
A certain type of brick was selected by Mr. and Mrs. Popich and was timely received on the building site by the contractor. Mr. and Mrs. Popich were dissatisfied with the brick delivered because of an alleged variation in color and rejected them. Approximately three weeks elapsed before they made selection of another type of brick. After the selection was made an *607 order was placed immediately and delivery was made in due course. Fox contends that the five or six weeks’ delay attributable to the rejection and reorder of the brick is chargeable to Popich and accounts for the noncompletion of the house by August 13. This issue will be discussed more fully below in connection with the claim for damages for delay in completion.
On September 9, 1965, while the building was still incomplete, the area was subjected to the devastating effects of hurricane “Betsy.” The house in question was extensively damaged. Fox was protected by builder’s risk insurance and in due time reached a settlement of the insurance claim.
In the meantime it became necessary for emergency protective measures to be taken. Labor and materials were scarce because of extensive damage to property in the area. We have no doubt that this further delayed repairs and completion of the house. A dispute arose between Fox and Popich over the delays and alleged unsatisfactory completion of the house and repairs of storm damage. On June 28, 1966, Popich filed a notice of default in the office of the Recorder of Mortgages and on the next day or at the latest by July 1, he moved into the house.
In addition to Popich’s claims for liquidated damages for noncompletion by August 13, 1965 and attorney’s fees, we have the usual issues of substantial performance and numerous disputed items of incompletion, improper repair or replacement of damaged parts, unskilled and substandard workmanship and the conflict of testimony of experts both as to the disputed items and the estimated costs involved.
Clearly this is a case of substantial performance and the owner is obligated to pay in full the contract price less the cost of making the necessary repairs or in completing the work contemplated by the building contract. The burden of proof of this cost is upon the owner. U-Finish Homes, Inc. v. Michel, 183 So.2d 101 (La.App. 1st Cir. 1965); Federico v. Kratzberg, 163 So.2d 843 (La.App. 4th Cir. 1964); Loeb v. Neilson, 128 So.2d 447 (La.App. 4th Cir. 1961).
Prior to trial below, by agreement of all parties, the trial judge, accompanied by the attorneys and the parties litigant, inspected the house in question. In his “Reasons for Judgments,” after holding that Popich was obligated for payment of the contract balance of $15,468.67 to Fox, the trial judge further found and held as follows:
“The Court spent considerable time in inspecting the house and could only conclude that there was much to be desired in the workmanship in the construction of same. Many defects were found and they are as follows:
1. The roof was not installed properly. (sagging in left front and back)
2. The garage door would not open and close.
3. The passage doors in the house were not plumb and therefore did not open and close properly.
4. The terrazzo was cracked in front of fire place and elsewhere throughout the house.
5. Cabinets in the kitchen should be replaced.
6. Cabinets in the bathroom should be replaced.
7. Sheet rock not finished properly in certain areas.
8. Front porch column not plumb.
9. Chipped and cracked bricks throughout.
10. Replace bathroom fixtures that were blistered by salt water.
11. Insulation in attic should be replaced where it was damaged by Betsy.
*608 12. Leak in roof over fire place.
13. Slab needs finishing in spots.
14. Fire place needed to be finished.
The Court was also informed that Mr. Popich performed certain repairs which he himself paid for and proof was offered to show that amount.
“The Court is of the opinion that it would take Seven Thousand Six
Hundred Fifty and no/100 ($7,650.00) Dollars to repair the defects found and put the house in an acceptable condition plus an additional Four Hundred Eighty-five and no/100 ($485.00) Dollars spent by Mr. Popich or a total of EIGHT . THOUSAND ONE HUNDRED THIRTY-FIVE and NO/100 ($8,135.00) DOLLARS.
“The Court is also of the opinion that each party should bear their own cost.”
No mention was made of the issues of damage and attorney’s fees and we must hold that Popich’s claims for these items of damage were rejected. Nicholson v. Holloway Planting Company, 216 So.2d 562 (La.App. 1st Cir. 1968); Melde Tile Roofing Co. v. Compact Homes, Inc., 92 So.2d 735 (La.App.Orleans 1957); Williams v. Ralph R. Miller Shows, 15 So.2d 249 (La.App. 1st Cir. 1943).
We have attempted in vain to determine how the trial judge arrived at the figure $7,650, and both counsel in their briefs filed in this court concede that this figure is “inexplicable.” We will, therefore, endeavor to determine which of the disputed items and the cost of correction of each the owner, Popich, has borne the burden of proving, and we will render such judgment as we deem just and proper on the record before us on this appeal. LSA-C.C.P. art. 2164.
Early in November, 1966, Popich prepared a list of 40 items of alleged improper workmanship or damage not repaired. He submitted the list to Elmer C. Gilcrease, general manager of B & G Construction Company, Inc., for an estimate of cost of correction. On November 9, 1966, Gil-crease made a bid to furnish the labor and materials to do the work covered by 32 of the 40 items for the sum of $16,800. This is the basis of a substantial portion of Po-pich’s claim in reconvention and in his suit against the surety. We have examined item by item Gilcrease’s testimony given at the trial below to determine which items appear to represent valid claims and his cost estimate on each. His testimony relative to the following items should be discussed specifically:
Item 1. Tile patio and front porch because of flaking and chipped concrete, $230. On cross-examination Gilcrease admitted that he could not recall the condition of the porch and patio and could not verify this need.
Items 3 and 29. Replacement of insulation in attic and walls and treatment of studs inside walls to compensate for alleged water damage, $5,000. Gilcrease said this would require removal and replacement of Sheetrock, wall paneling and trim with required finishing and painting. On cross-examination he acknowledged that he would not do this extensive work on his own house at that late stage of construction because of the impracticability, but it was his opinion that it should have been done.
Item 24. Replacement of all outside aluminum windows because of oxidation as a result of exposure to salt water, $3,000. Gilcrease said, however, that he would accept the windows as they were rather than undertake this expense. He acknowledged that oxidation of aluminum windows is a normal condition in the salt air area and if the windows were replaced they would oxidize again. This opinion was also expressed by the expert witness Maxwell. Maxwell did not attribute the oxidation to “Betsy” but Gil-crease expressed the opinion that the oxidation had been accelerated by the hurricane.
*609 Item 26. To correct stains in terrazzo floors throughout the house, $3,900. Gil-crease’s cost estimate for replacement of the terrazzo was $1,500; the balance, $2,400 was for carpet to be laid over the terrazzo. Carpet was not included in the building contract.
An item not among the 40 listed by Po-pich for replacement of marble on hearth, $200, was included in Gilcrease’s total bid but he said he would not recommend this item.
If we eliminate the foregoing items which Gilcrease could not justify or recommend and the $2,400 for carpets, which should not hqve been included, Gilcrease’s estimate of $16,800 is reduced to $5,970. There is, however, other testimony, some of which is disputed, bearing on the need of the items listed by Popich and their respective costs. We will attempt to reconcile those conflicts as we discuss each item below.
The trial judge, in his “Reasons for Judgments” quoted above, listed 14 defects resulting from improper workmanship, but did not indicate the respective amounts necessary to make correction. We will discuss each of those items.
First, the testimony clearly supports the trial court’s finding that the roof was not level and should be corrected. The experts for Popich who testified relative to the conditon of the roof and the estimated cost of correction were Warren J. Nolan, an architect; A. W. Thompson, a consulting civil engineer; and Gilcrease. For Fox and his surety the experts were Marvin M. Maxwell, an architect, and Robert Haase, a civil engineer and general contractor. All with the exception of Nolan testified that there was a sag in the roof line.
It is significant that Nolan, who inspected the house in November 1965 and again on August 31, 1966 and after each inspection made a report by letter to Popich, made no mention of this defect in his testimony or in his written reports to Popich. He recommended complete replacement of shingles on new felt over the entire roof. He testified that he found many broken shingles and that since this was a new house it should have all new shingles to avoid the undesirable appearance of contrast between' old and new shingles. He made no estimate of the cost. All the other experts were in agreement that the sagging condition could be remedied by very practical and relatively simple methods. Maxwell declined to say how, specifically, without further inspection, but Haase, Thompson and Gilcrease agreed that it could be jacked up and held in place by supporting braces in the attic. Neither of them thought this procedure would damage the roof, but it might call for replacement of a few shingles. Thompson saw this possibility as presenting no “serious” problem.
Only Haase and Gilcrease testified as to cost of correction. Haase estimated $477 and Gilcrease, $310 plus $150 for replacement of shingles, total $460.
The trial judge addressing a comment from the bench to the witness Thompson said he had seen the roof and agreed with Haase that it had a sag of “about” two inches.
We do not reject completely the opinion of Nolan that the appearance of the shingles has importance to the owner of a new house; but, in view of the fact that it was all practically new construction, we think the application of new shingles among others which had been exposed to the weather a relatively short time would very soon take on the appearance of the old. We think his recommendation of a completely new roof is entirely unreasonable. We, therefore, accept the estimates of Gilcrease and Haase, which are only $17 apart, and will allow $477 for correction of the roof.
The next item found by the trial judge to have been improperly installed was the garage door. The testimony clearly sup *610 ports this finding. There was some testimony about the installation of a mechanical power device for lifting the door. This was not included in the contract. The witness Gilcrease estimated the cost of correction by replacement at $180. Haase estimated the maximum cost of double nonme-chanical garage door to be $350. We will allow that amount for this item.
The doors inside the house were found not to be plumb and did not open and close’ properly. We concur in this finding of fact. The evidence is that the hinges on some doors were not properly set causing some doors to be slightly off perpendicular, consequently they had a tendency to swing closed or open if not latched. Some latches were not in perfect alignment. This called for a relatively simple adjustment. The estimated cost of this correction was $26 by Haase and $5 or $6 per door -by Gilcrease. There is no testimony as to the number of such doors. We will, therefore, allow $26 for this item.
The next item of improper or defective workmanship found by the trial judge was the terrazzo floor in which cracks had appeared. The existence of cracks in some degree is not disputed, and there was also testimony of stains on the terrazzo. The experts disagreed as to the seriousness of this condition and the proper remedy for correction. The cost would be affected substantially by the method employed. Mr. Nolan recommended that the terrazzo floor be completely redone. Gilcrease estimated the cost at $1,500 but would not guarantee that the floor would not crack again. He emphasized that he was not experienced in terrazzo work and had no knowledge of the methods employed in filling cracks.
B. R. Dinon, a terrazzo contractor, testified on behalf of the contractor as an expert. This witness said an approved method of filling cracks in terrazzo employs the use of polyester or epoxy matrix. He said there is no guarantee against cracks in terrazzo and this method of repair gives the best results and is the best method known. Mr. Maxwell found the subfloor to be solid and recommended the epoxy matrix patch remedy. Haase’s estimate of cost of repair using this method was $250.
The testimony supports the conclusion that any terrazzo floor is likely to develop cracks, in view of which, where the sub-floor is solid, unless the terrazzo is entirely substandard or the cracks abnormally large and unsightly, it would be impractical and probably of no lasting value to tear up and redo the floor. The testimony in the record before us does not indicate such serious defect existed, but at most relatively small inconspicuous cracks. Such was not the fact situation upon which we allowed recovery on the basis of cost of a completely new floor in Martin v. Dinon, 140 So.2d 246 (1962). Nevertheless, Mr. Po-pich contracted for a new house and has the right to expect delivery of a new construction without a patched floor. If he gets a patched floor or an imperfect one he gets less than he contracted to receive. If he elects to live with the patch or imperfection rather than have it entirely eliminated, he should be allowed a reduction in the contract price as compensation therefor. An allowance of $1,500 for this item is reasonable.
As a result of water up to 14 inches in depth having entered the house and having remained for a few days as a result of the hurricane, the cabinet doors and lower shelves of the cabinets in the kitchen and bathrooms were damaged. The testimony clearly supports the conclusion that the cabinet doors should be replaced. The owner should not be required to accept a mere refinishing of the doors, but the testimony does not support a finding that the shelves could not be refinished to meet specifications. For replacement of cabinet doors and refinishing shelves to remove stains in the kitchen and bathrooms, Haase testified the cost would be $519. We have no comparable estimate from Gilcrease or any other expert. Gilcrease’s bid of $1,980 included replacement of all lower cabinets with ceramic tops in the kitchen and $660 *611 for replacement of the bathroom cabinets. The necessity of these replacements was not established by convincing testimony, We will, therefore, allow $519 for these items.
The trial judge found that the Sheetrock had not been finished properly in certain areas. We will not disturb this finding of fact.
We discussed above and rejected Mr. Nolan’s recommendation for replacement of all Sheetrock and Gilcrease’s bid for the work. Sheetrock is manufactured in 4-by-8-foot sheets. The ceiling was 8 feet high and the Sheetrock was placed on the walls horizontally. The flooding damaged the lower portion of the walls. The bottom sections of Sheetrock were removed and new Sheetrock was installed. We are convinced that there was no need to remove the upper sections.
It is difficult to determine from the testimony to what extent the refinishing of the Sheetrock was improper. We will, however, accept Gilcrease’s testimony on behalf of Popich that the Sheetrock refinishing at “fifteen cents per foot” would come to $432. Since he contemplated a total Sheetrock replacement, this figure is perhaps computed on that basis and may not correctly represent the amount of finishing necessary as a result of partial replacement. We will, however, allow that amount for that item.
The front porch column which was found to be out of plumb can be corrected for $200. There was no dispute of this item and it will be allowed.
The trial judge found “chipped and cracked bricks throughout” but there is no indication of the amount allowed for this item, except as may be inferred from the trial judge’s comment during the testimony of the witness Thompson that Mr. Haase had testified it would cost $350 to correct this condition. We are unable to verify this figure from a review of Haase’s testimony. Mr. Popich’s expert witness Gil-crease, when questioned relative to this item, being number 16 on Popich’s list described as “brick work not complete, corner bricks broken off, cracked bricks used and bricks not cleaned from excess mortar and cement,” said he had omitted that item.
The record supports the trial judge’s finding of fact that imperfections were apparent in the brick work, but there is no testimony to which we can point in the transcript before us where the cost of this specific correction was estimated. Counsel for Fox in his brief filed in this court does apparently concede, however, that an allowance of $350 for this item “was, or should have been,” made. We will therefore accept this figure for that item.
There is little or no dispute that the bathroom fixtures, meaning faucets and other metal parts, were corroded by salt water and should be replaced as found by the trial judge. The testimony of Mr. Gil-crease provides the only separate estimate of this cost, which he fixed at $80. We will make allowance accordingly.
The trial judge found “insulation in the attic should be replaced where it was damaged by Betsy.” The testimony does not support a finding of fact that all the insulation should be replaced, except as indicated in the testimony of Mr. Nolan. The extent to which it was damaged by hurricane “Betsy” calling for replacement in the opinion of the trial judge and the cost therefor cannot be determined from the testimony in the transcript before us. We made reference above to Gilcrease’s testimony that he would not recommend replacement of all insulation, but he did indicate that some correction of the insulation in certain areas appeared necessary. The owner, Popich, has failed to discharge the burden of proof of this cost.
There is evidence to sustain the finding of fact of a leak in the roof over the fireplace. We do not find any proof of cost or estimate for this repair except $120 for installation of proper flashing around the chimney. We will allow $120 for that item.
*612 There was testimony to support the trial judge’s finding of improper cement finishing in the concrete foundation slab. Item number 15 on Popich’s list of 40 is “Cement work on foundation showing not complete.” His witness Gilcrease in respect to this item said: “I have estimated labor cost $25.00 for just general cleaning up and minor touching.” Mr. Haase, however, included in his estimate an item designated as number 8 “Repair six (6) cracked exterior corners of building slab by removing loose concrete and replacing with epoxy concrete.” He testified that he proposed to do this for $297. It is apparent that he and Gilcrease were not referring to the same thing. We will accept the Haase estimate of $297 as probably more nearly correct and will make allowance accordingly.
We cannot concur in the final item found by the trial judge, namely, refinishing of fireplace. Mr. Popich testified that a man named Simmons was engaged by him to tile the patio and to place marble on the fireplace hearth. He was unable to recall what he paid Simmons but thought the hearth was $180. He admitted, however, that this was not a part of the contract. We will make no allowance for this item.
From the foregoing item-by-item analysis of the 14 specific findings of the trial judge we find a total of $4,351 should be allowed the owner for those items as a credit or off-set against the balance due on the contract price. Additionally, we think there are other items for which allowance should be made.
Mr. Popich has made claim for $500 due for certain alleged credits. We find practically no testimony in support of this claim. We have no doubt that Mr. Popich employed several workmen to do various things in an effort to correct certain alleged defects, but he failed almost entirely to carry the burden of proof necessary to sustain a judgment. Apparently he kept no records, some payments were made by cash, others by check (allegedly); but no canceled checks were filed in evidence, and his recollection of amounts paid and to whom was very uncertain. We cannot find any basis for the trial judge’s conclusion that Mr. Popich spent $485. We do not discredit Mr. Popich, who might very well have spent this sum and more, but we are bound by the evidence before us and must hold that he has not discharged his burden of proof in this respect. We will, however, allow $57.05 to reimburse Popich for that amount paid Forest St. Ann, who made some minor adjustments and installations.
There is testimony that the gutters and certain metal louvres were damaged by the hurricane and not repaired properly. Mr. Popich testified that he engaged a sheet metal man in Buras, identified only as Mr. Kolb, to replace louvres in three gables at a cost of $140. His proof of the exact amount of this cost is entirely from memory and reflects some uncertainty, but we will accept this figure as reasonable and make allowance accordingly.
Mr. Gilcrease estimated the cost of replacing 30 feet of damaged gutters at $30 plus $20 for labor in repairing gutter leaks. We will allow this $50.
There is enough evidence of damage to the outside paint by mildew to make an allowance for this also. The only estimate of cost is that of Mr. Gilcrease of $240 which we will accept as a reasonable estimate to repaint the outside trim of the house.
The foregoing items which we find sufficient proof to sustain total $487.05. This sum added to the $4,351 we found to be due for the items enumerated by the trial judge in which we concurred, makes a total of $4,838.05 to be credited against the contract price.
Coincidentally this amount is approximately 10 percent of the amount of the contract plus extras, thus indicating a 90-percent completion. This substantiates our *613 conclusion above of substantial perform-anee.
All other claims upon allegations of defects, incompletion and substandard workmanship are rejected for failure of the owner, Popich, to carry the burden of proof by a preponderance of evidence.
We are not unmindful of the jurisprudential rule which counsel for Mr. Po-pich has invoked on appeal relative to the failure of the contractor Fox to testify on the trial of the case below. The presumption against Fox’s interest has been given due consideration but does not change our decision based on the record before us.
We will now address ourselves to the issues of damages for delay in completion and attorney’s fees.
We said above that five or six weeks’ delay in completion of the house resulted from the delay occasioned by the rejection and reorder of brick. We are not convinced that the first brick delivered failed to meet specifications or were at variance from the selection initially made by Mr. and Mrs. Popich. Regardless of the reason for their rejection and substitution of another type of brick, we must hold that they cannot recover damages on account of the delay caused by the substitution through no fault of the contractor. Farnsworth v. Sewerage & Water Board of New Orleans, 173 La. 1105, 139 So. 638 (1932). This delay extended the completion date from August 13 to sometime after September 9 when hurricane “Betsy” struck with devastating force causing the house to be damaged and thus further delaying its completion. Certainly this was a fortuitous event and the delay caused thereby was not chargeable to the contractor. We therefore will affirm the trial court’s denial of the damages claimed for delay in completion. LSA-C.C. arts. 1933 (2), 2120; Hughes v. Breazeale, 240 La. 126, 121 So.2d 510 (1960) ; Farnsworth v. Sewerage & Water Board of New Orleans, supra; Harper v. Home Indemnity Company, 140 So.2d 653 (La.App.2d Cir. 1962).
The claim for attorney’s fees in the amount of $2,183 is based on the provision of the contract quoted above. It is significant that this provision in the contract is in that part which relates exclusively to the bond and specifically imposes this contingent liability, not on the contractor, but on the surety. It is not a part of the contract between Fox and Popich. It was written into the surety contract to comply with the provisions of LSA-R.S. 9:4802, and in respect to attorney’s fees LSA-R.S. 9:4810. We therefore hold that insofar as the claim for attorney’s fees was made against Fox, the contractor, by way of reconvention in suit number 9515 (number 3758 on the docket of this court), the recijnvenor, Popich, has failed to establish a cause of action. In the absence of a contractual agreement or provision of law specifically for attorney’s fees there can be no recovery. Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (1959); McNeill v. Elchinger, 231 La. 1090, 93 So.2d 669 (1957); Chauvin v. La Hitte, 229 La. 94, 85 So.2d 43 (1956).
LSA-R.S. 9:4801-42 relative to “Private Works” obviously was designed primarily to protect laborers, craftsmen, subcontractors, materialmen, etc. When a private works contract is entered into pursuant hereto the provisions of section 4802 require the owner to give a bond in a prescribed amount. This mandate is imposed upon him not for his protection, though there are certain benefits to him, but for the protection of those named in the act. Section 4810 provides for attorney’s fees in concursus proceedings, which explains the inclusion in the above-quoted provision in the surety contract of attorney’s fees in “concursus or other legal proceedings * * *»
The question of recovery of attorney’s fees by the owner from the surety under a contract pursuant to this section was squarely answered by the Supreme Court *614 in Costanza v. Cannata, 214 La. 29, 36 So. 2d 627 (1948). There the Court said:
“The basis for the plaintiffs’ right to attorney fees is to be found in section 10 of Act No. 298 of 1926 [LSA-R.S. 9:4810], and it is limited to compensation for provoking the concursus proceeding. It is not extended to include the services of such attorney in connection with the prosecution of the claims of the owner against the contractor and his surety. * * *” 36 So.2d at 631.
This effectively disposes of the owner’s (Popich’s) claim against the surety for attorney’s fees in this case. Accordingly the claim is denied.
The only remaining issue is that of expert witness fees. In answer to the appeal in suit number 9779 (number 3757 on the docket of this court), the appellee, Popich, prays for amendment of the judgment to provide recovery to him of $500, being $100 each for five expert witnesses. The judgments appealed do not include an allowance of expert witness fees and are silent on the matter of court costs. In his “Reasons for Judgments” the trial judge expressly declared that each litigant should bear his own cost. In view of the judgments rendered, this was a proper exercise of his discretion. LSA-C.C.P. art. 1920. The judgment in this respect is equitable and will not be disturbed. LSA-C.C.P. art. 2164.
In suit number 9515 (number 3758 on the docket of this court) the judgment in favor of the plaintiff H. Bennett Fox against Joseph A. Popich in the principal sum of $15,468.67 is affirmed. It is further ordered, adjudged and decreed that insofar as said judgment denies by implication and silence the reconventional demand of plaintiff in reconvention, Popich, the same is reversed and there is now judgment in favor of Joseph A. Popich, plaintiff in reconvention, against H. Bennett Fox, defendant in reconvention, in the sum of $4,838.05 with legal interest from date of judicial demand, said judgment to be set off against the judgment rendered in favor of Fox against Popich.
It is further ordered, adjudged and decreed that the judgment in favor of Joseph A. Popich in reconvention in the principal sum of $4,838.05 be solidary with the judgment for the same amount and for the same cause in favor of Joseph A. Popich against Fidelity and Deposit Company of Maryland in appeal number 3757.
In suit number 9779 (number 3757 on the docket' of this court) the judgment in favor of Joseph A. Popich against Fidelity and Deposit Company of Maryland in the principal sum of $8,135 is amended and reduced to the principal sum of $4,838.05 and is made solidary with the judgment for the same amount and for the same cause in favor of Joseph A. Popich, plaintiff in re-convention, against H. Bennett Fox, defendant in reconvention, in appeal number 3758, and as thus amended it is affirmed.
The costs of appeal are assessed against H. Bennett Fox, appellee in appeal number 3758, and against Joseph A. Popich, appel-lee in appeal number 3757.
Judgments affirmed in part, reversed and rendered in part; amended and affirmed.