328 So.2d 686 (1976)
John H. WHITE, d/b/a White Construction and Equipment Rental Company, Plaintiff and Appellee,
v.
RIMMER & GARRETT, INC., Defendant and Appellant.
No. 5294.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1976.
Rehearing Denied April 7, 1976.
Writ Granted June 2, 1976.
*687 Aaron, Aaron & Chambers by Noble M. Chambers, Jr., Crowley, for defendant-appellant.
Camp, Carmouche, Palmer, Carwile & Barsh by Karl E. Boellert, Lake Charles, for plaintiff-appellee.
Before HOOD, CULPEPPER, DOMENGEAUX, GUIDRY and PAVY, JJ.
DOMENGEAUX, Judge.
This is a suit for breach of a construction subcontract. Plaintiff-appellee, the subcontractor will be hereinafter referred to as White, and defendant-appellant contractor will be hereinafter referred to as R & G, Inc.
The subcontract provided for certain excavation work to be performed by White in conformance with a primary contract between R & G, Inc. and the Louisiana Department of Highways. The District Judge concluded that White was entitled to excavate, haul, and deposit 1,000,000 cubic yards of fill and no more. In that White had only excavated and moved 985,650 cubic yards by the time difficulties apexed between the parties, the District Judge awarded White the sum of $13,130.25, based on the difference at $0.915 per cubic yard. R & G, Inc.'s reconventional demand was denied. R & G, Inc. has appealed and White has answered the appeal seeking an increase in the award.
The issues are:
1. Was the subcontract with its two supplements, ambiguous? *688 2. What portion of Item 203(5) in the primary Louisiana Department of Highways contract was White entitled to haul under its subcontract with R & G, Inc.?
3. Did R & G, Inc. interfere with the performance by White of its obligations, duties and responsibilities under its subcontract with R & G, Inc.?
4. Did White breach its subcontract with R & G, Inc. by improperly excavating the slopes of the borrow pits such that accurate measurement of the dirt removed therefrom could not be accomplished?
5. What is the proper measure of damages for the amount White was entitled to haul but was allegedly prevented from hauling?
The suit arises out of a written contract entered into between R & G, Inc. as contractor and White as subcontractor. Prior to entering into that agreement, R & G, Inc. was the successful bidder and entered into a public contract with the Louisiana Department of Highways for the construction of a portion of the 1-210 bypass in Lake Charles, Louisiana. The portion of the primary contract with the Louisiana Department of Highways which is of concern in this suit is that designated as Item 203(5). The description contained in the contract of Item 203(5) was "Cubic YardsSpecial Borrow Excavation". The "approximate quantity" was listed as 1,738,540 cubic yards.
Mr. Bob Young, Branch Manager and Salesman for Furlow-Laughlin Company, a heavy equipment dealer, contacted Mr. Tom Garrett, President of R & G, Inc., inquiring whether Mr. Garrett was interested in negotiating with earth moving contractors to move the dirt referred to in the Department of Highways contract. Mr. Garrett indicated that he was interested, and as a consequence Mr. Young introduced the plaintiff John H. White to Mr. Garrett. Young knew White and had previous business dealings with him, having sold equipment to him on prior occasions. Garrett and White began negotiations culminating in the subcontract wherein White was to perform Item 203(5) of the primary agreement with the Louisiana Department of Highways.
Apparently Mr. Young's motivation in securing a contractual agreement between Mr. Garrett and Mr. White was that in the event Mr. White did undertake the contract he would purchase a Cohen 1066 Backhoe from Furlow-Laughlin through Mr. Young. Upon confection of the agreement, Mr. White did in fact purchase the backhoe from Mr. Young and also purchased dump trucks for the job. The total of all of these purchases was some $456,000.
The subcontract dated October 9, 1971, was on a standard AGC Form which Mr. Garrett supplied. That agreement provided:
"The subcontractor shall furnish all labor, materials and equipment and shall perform all the work for [Item No.203(5)]."
The unit price for this work then was provided on a declining sliding scale according to quantity of special borrow excavation. The agreement provided that the subcontract was to be completed within 400 days from its date. The parties also agreed that R & G, Inc. was to spread, compact and shape the dirt. This, however, was only an oral agreement and was not contained within the written document. Within five days of the signing of the contract, however, a supplemental agreement was added to it. That agreement was for the purpose of specifying and clarifying the duties and obligations of the subcontractor, White, under its agreement with R & G, Inc. Particularly, that agreement provided that Mr. White's obligations were only to load, haul and spot dump on the project although it contained other minor provisions. Additionally, the supplement stated "The *689 minimum special borrow quantity will be 1,000,000 cubic yards." It also provided that any special borrow located north of Interstate 10 was not to be included within the terms of the agreement.
The contractor, R & G, Inc., purchased the land on which the excavation was to be performed, and work began in the fall of 1971. The job progressed until early spring of 1972 when disagreement arose over the area which was to be excavated. It seems that at this time R & G, Inc. had decided to alter the original shape of the excavation (borrow) pits for aesthetic reasons. It planned to convert the pits to lakes and develop a subdivision in the area around them. Mr. White objected to this and refused to go outside the original configuration of the pit, saying that he needed some sort of letter or other authorization before changing the original agreement. Mr. White then drew up a list of thirteen demands and presented them to R & G, Inc. As a result of this dispute, a second amending supplement dated April 10, 1972, was added to the contract. That document was prepared, considering the list of thirteen demands presented by Mr. White. The parties agreed that all excavation would be in conformance with a new plat; in fact Supplement Two stated "The excavation area or pit is as shown on the plat of Waterloop Subdivision prepared by Shutts & Son, dated January 21, 1972." Additionally, it was agreed that White Construction Company would be paid a flat rate of "0.915 dollars per cubic yard for all material removed or to be removed, including material removed to date hereof." (This is a significant increase in the graduated scale in the original subcontract, as is shown hereafter.) The agreement, among other things, also provided that R & G, Inc. would provide a "bleeder" ditch and adequate drainage around the excavated area. A handwritten provision was then added by the parties and initialed by them providing "1,000,000 cu. yd. guaranteed". Mr. Young was present at the signing and initialing of the second supplement, and in fact it was he who added the provision for the "1,000,000 cu. yd. guaranteed".
Work once again commenced in conformance with the new agreement as set forth in the second supplement. Difficulties arose, however, and the instant suit was filed on March 19, 1973, for specific performance, accounting and/or damages. Defendant reconvened alleging failure and refusal of the plaintiff White to abide by the conditions of the contract as amended. After trial on the merits and judgment in favor of plaintiff, the instant appeal was perfected by defendant, R & G, Inc., and answered by plaintiff White.
The original subcontract provided:

 ARTICLE 2
 THE WORK
The Subcontractor shall furnish all labor, materials and equipment and shall
perform all the Work for
ITEM # DESCRIPTION UNIT QUANTITY UNIT. PRICE AMOUNT
203(5) Special Borrow Excav. CY 1,000,000 $.90 $900,000.00
203(5) Special Borrow Excav. CY 1,100,000 .895 $984,500.00
203(5) Special Borrow Excav. CY 1,200,000 .89 $1,068,000.00
203(5) Special Borrow Excav. CY 1,300,000 .885 $1,150,500.00
203(5) Special Borrow Excav. CY 1,400,000 .88 $1,232,000.00
203(5) Special Borrow Excav. CY 1,500,000 .875 $1,312,500.00
203(5) Special Borrow Excav. CY 1,600,000 .87 $1,392,000.00

*690 Plaintiff White contends that the above language indicates that he is entitled to the entirety of the Item 203(5). He says the only exception to this is the area north of the Interstate 10 which is excluded expressly by supplement No. 1, and a "scraper item" of 75 to 125,000 cubic yards, which pursuant to an oral agreement between him and Mr. Tom Garrett, was to be excavated by R & G, Inc. He claims that he contracted to perform all of Item 203(5) and that it was the understanding and agreement of the parties that he would undertake to excavate and haul all of that item.
Defendant R & G, Inc., on the other hand, contends that White was only entitled to excavate and haul 1,000,000 cubic yards. In support of this proposition they point to the provisions contained in supplement one providing for a minimum special borrow quantity of 1,000,000 cubic yards, and in Supplement Two which included the words "1,000,000 cu. yds. guaranteed". (Emphasis added).
Much testimony is contained in the record of this matter as to the intention of the parties, as to how much fill White was to excavate and haul. Both Mr. Thomas Garrett and Mr. Larry Garrett, (Vice-President and general supervisor of R & G, Inc.) stated that their intention from the beginning was to grant White only 1,000,000 cubic yards, and that after that figure was reached R & G, Inc. had the discretion to allow Mr. White to remove any more dirt. Conversely, the plaintiff White testified that he understood the agreement to be that he was entitled to excavate all dirt needed for the construction project. Mr. Bob Young testified to the same effect, and both men testified the minimum guarantee was inserted only for Mr. White's assurance that he could safely purchase his new equipment.
This testimony, though, may only be considered if the contractual agreement between the parties is ambiguous, for parol evidence is ordinarily inadmissible. LSA-C.C. Article 2276; Hyatt v. Hartford Accident & Indemnity Company, 225 So.2d 102 (La.App.3rd Cir. 1969). Where possible, the interpretation of an agreement should be made by resort to the four corners of the document itself, LSA-C.C. Article 1945, and that interpretation is to be based upon the true intent of all parties to the agreement, LSA-C.C. Article 1945, even if its meaning is doubtful, LSA-C.C. Article 1950.
We find ambiguity in the present subcontract as amended by Supplements One and Two. Consequently the trial judge was not in error in considering the parol evidence to determine the effect of the agreement and the intentions of the parties. At argument on appeal, White's able counsel very honestly and candidly admitted that the insertion of the word "minimum" in Supplement One and of the word "Guaranteed" in Supplement Two injected some uncertainty into the contract documents.
The rule stated in Cardos v. Cristadoro, 228 La. 975, 84 So.2d 606, (La.1955) is applicable here:
"As a general rule, parol evidence is inadmissible to vary, modify, explain or contradict a writing. This general rule, as is true with most general principles, has been made the subject of certain exceptions. The pertinent exception applicable here is that where the words used in an instrument are not clear and explicit and may in their application lead to absurd consequences, or where its contents exhibit ambiguity and uncertainty, or where the mutual intention of the parties has not been fairly explicit, the courts may consider all pertinent facts and circumstances, including the party's own conclusion of its meaning, rather than adhere to a forced meaning of the terms used."
The original contract is unambiguous and clearly provides that White is to haul *691 all of Item 203(5). Supplement One, dated October 14, 1971, is likewise free of uncertainty, and compatible therewith. The word "minimum" infers or connotes the existence of a "maximum". The minimum at this point is 1,000,000 cubic yards and Supplement One excludes from Item 203(5), the hauling by White of any fill from the portion north of U.S. Interstate Highway 10. At this point we find no ambiguity in the contract documents and determine that the agreement at that time was to the effect that White would haul and spot dump all of Item 203(5), less that portion located north of I10, (less other amounts shown in Footnote 1) with a minimum to White of 1,000,000 cubic yards.[1]
In our opinion the agreement between the parties was drastically changed on April 10, 1972, when the parties executed Supplement No. 2. The addition of the words "1,000,000 cubic yards guaranteed" injects some ambiguity when compared to the reference to "all" of the work in the original contract, and the word "minimum" in the first supplement. We do not conclude that the word "minimum" and the term "guarantee" necessarily mean the same thing.
Additionally, under paragraph one of Supplement Two the parties agreed that "the excavation area or pit is as shown on the plat of Waterloop Subdivision prepared by Shutts & Sons, dated January 21, 1972." Prior to execution of Supplement Two, White was to haul all of Item 203(5), less that part north of I10 from a land area or areas furnished by defendant R & G, Inc. However, Supplement Two specifically designates the only excavation area or pit from which White is to haul as the area shown on the Shutts plat.
It appears that it was known by the parties at the time when Supplement Two was executed that there was not sufficient fill in the new exclusively designated area to satisfy Item 203(5). Such being the case, then, the restriction of White to this area is inconsistent with any contention that he was entitled to haul and spot dump the whole of Item 203(5) following execution of Supplement Two. Further support for the view that as a result of Supplement Two White no longer had the right to haul all of Item 203(5) is found in paragraph two of Supplement Two. Under that paragraph R & G, Inc. agreed to increase White's compensation to a flat $0.915 per cubic yard for all material previously removed and to be removed in the future and guaranteed payment to White for 1,000,000 cubic yards. White suggests that the increase in price was agreed to because of the strange and difficult configuration of the pit and the consequent difficulty in digging and hauling. It is reasonable to conclude, in light of the provisions of paragraph one of Supplement Two, that the increase in price and the 1,000,000 cubic yard guarantee was to compensate White perhaps for the above. However, it is also reasonable to conclude that White was being restricted to this one pit area, which had been reduced in size by the creation of the Waterloop Subdivision, and that as a consequence, he would not haul and spot dump all of Item 203(5).
Further indication that White would no longer have the exclusive right to haul all of Item 203(5) following the execution of Supplement Two, is found in the fact that shortly after Supplement Two was signed, R & G, Inc. began to haul material out of the same pit along with White, and did so for some two months before White objected and claimed the whole of Item 203(5).
Therefore, based upon the ruling of the District Court and the statutory and *692 jurisprudential rules cited herein, we agree that the District Court was not in error in resorting to extrinsic evidence to determine the clear intentions of the parties to the subcontract. We find sufficient basis in the record to support the conclusion of the trial judge that the parties intended only that White was to excavate the first 1,000,000 cubic yards. This is essentially a finding of fact, and we find no manifest error nor abuse of discretion on the part of the trial judge in this regard. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
We have been cited to a rule of interpretation of contracts which states generally that if a contract is ambiguous, the terms thereof should be construed against the party which prepared it. Monsur v. Thompson, 300 So.2d 655 (La.App.3rd Cir. 1974). We do not find that rule applicable herein. Although the original contract was prepared on forms submitted by R & G, Inc., of significance is the fact that Supplement Two, although typed up by R & G, Inc. was done so at the behest of White, and the provisions thereunder were those suggested by White based upon his demand prior to the consummation thereof.
White urges additionally that he is entitled to damages for acts by R & G, Inc. in interfering with his performance of the subcontract. These alleged actions included failure by R & G, Inc. to provide a bleeder ditch from the pit, failure by them to provide more than one area for dumping the excavated fill causing crowding and congestion in the pit, requiring insurance certificates on White's rental trucks, and threats to throw White out of the excavation pit. As the trial court observed, the testimony is conflicting on this evidence, and we are unable to conclude that plaintiff White has borne his burden of proof on these issues. We find no manifest error nor abuse of discretion on the part of the trial court in this regard. See Johnson v. Heil, 284 So.2d 666 (La.App.3rd Cir. 1973).
R & G, Inc. filed a reconventional demand for damages allegedly caused by White's improper excavation of the slopes of the pit. They urge that because of White's operations, the slopes were uneven, thus preventing an accurate measurement or "cross-sectioning" of the pit by the Louisiana Department of Highways so that payment could be made by it to R & G, Inc. They state that because the pit was not properly excavated, it remained unmeasured throughout the winter of 1972 and through 1973, thus allowing silt to build up in the bottom so that even after final measurement, an accurate determination of the amount of fill removed was impossible. The trial judge denied R & G, Inc.'s reconventional demand. We find conflicting testimony relative to which party was at fault concerning the "silting" conditions which existed in some of the pits. There is evidence of some impropriety on the part of White in this regard; however, the trial judge has reached a conclusion of fact on these issues. We cannot say that he committed manifest error in denying the reconventional demand of R & G, Inc.
The final issue to be determined herein is the proper measure of damages for the amount White was entitled to haul. We have already concluded, under the contract documents, that White was entitled to haul 1,000,000 cubic yards and no more. He actually hauled 985,650 cubic yards, was paid therefor and was thus entitled to haul an additional 14,350 cubic yards. The trial judge awarded White the amount of $13,130.25 based on the rate of $0.915 per cubic yard. White contends that the proper method of computation of damages is the total contract price per yard which is $0.915. He states that this amount represents "stipulated" or "liquidated" damages under LSA-C.C. Article 1934(5). We find no provision in the instant contract or its supplements indicating a stipulated amount *693 as damages. Simply because a contract is drafted on the basis of a unit price does not mean that amount has been stipulated as damages in the event of its breach.
LSA-C.C. Article 1934 provides that in an action for breach of contract, the damages due are the amount of the loss sustained and the profit of which the contracting party is deprived. Harper v. Home Indemnity Company, 140 So.2d 653 (La.App.2nd Cir. 1962); Holmes Brick and Salvage Company, Inc. v. Reo Construction, Inc., 253 So.2d 562, (La.App.1st Cir. 1971); writ refused 260 La. 127, 255 So.2d 353. Loss Profit is determined by deducting the cost of labor and materials from the total contract price. Minyard v. Culotta, 128 So.2d 797 (La.App.4th Cir. 1961); Housecraft Division v. Jones, 120 So.2d 662 (Orl.La.App.1960). It is recoverable notwithstanding the fact that it is not susceptible of proof to a legal certainty. Southern Television Electronics v. L.O.D. Read, 244 So.2d 624 (La.App.4th Cir. 1971); Sheeks v. McCain-Richards, 226 La. 578, 76 So.2d 892 (La.1954); Pelican Printing Company v. Pecot, 216 So.2d 153 (La.App.4th Cir. 1968).
While White stated that he had expected to profit by approximately 31¢ per cubic yard on the project, he actually did not net that amount. His average profit over the contract period was 13.95¢ per cubic yard. This is computed from the testimony of Mr. Schram, White's bookkeeper, who stated that White's net income per cubic yard in 1972 was 25.8¢ and in 1973 was 2.1¢. Thus the total damage caused White by R & G, Inc. is $2,001.83 (14,350 × 13.95¢).
For the reasons assigned, the judgment of the trial court is amended to order payment by Rimmer and Garrett, Inc. to John H. White, d/b/a White Construction and Equipment Rental Company, in the sum of $2,001.83. In all other respects, the judgment is affirmed. Costs of this appeal are assessed to the appellee, White.
AFFIRMED, AS AMENDED.
CULPEPPER, J., dissents and assigns reasons.
PAVY, J., dissents for reasons assigned by CULPEPPER, J.,
CULPEPPER, Judge (dissenting).
It is my view that the original subcontract, as amended by the first and second supplements, is not ambiguous as to the provision that the plaintiff, White, had the right to excavate and haul all dirt needed under Item 203(5), except for that portion located north of I10 and that included in the "scraper item", which defendant was going to move with its scrapers.
The majority agrees that the original subcontract is not ambiguous in this respect. The majority also agrees that the first supplement, dated October 14, 1971, is likewise free of uncertainty, in that the insertion of the word "minimum" can mean only that White was entitled to excavate and haul a minimum of 1,000,000 cubic yards. However, the majority holds that the insertion of the words "1,000,000 yards guaranteed" in the second supplement, dated April 10, 1972, injects ambiguity. It is my view that this clause can mean only that White was guaranteed he could excavate and haul at least 1,000,000 cubic yards. It cannot mean that this was the maximum amount which White could haul, nor can it mean that the plaintiff White lost his right, as clearly agreed to in the original subcontract and the first supplement, to excavate and haul all dirt needed for Item 203(5).
However, even if the use of the term "guarantee" in the second supplement does inject some ambiguity, it is my view that the agreement should be construed in favor *694 of White. My first reason is that it should be construed against the defendant, Rimmer & Garrett, Inc., who prepared all of these agreements. A fundamental rule of the construction of contracts is that the agreement is interpreted against him who drew it. Monsur v. Thompson, 300 So.2d 655 (La.App.3rd Cir. 1974), and the authorities cited therein. If defendant intended the agreement to restrict White to 1,000,000 cubic yards, it could easily have so specified
Furthermore, I think a consideration of the parol evidence shows clearly that the intention of the parties was at all times that White should excavate and haul all of the dirt required for Item 203(5). The first significant fact to me is the way in which this word "guarantee" was added to the second supplement. It was not added by plaintiff nor by defendant, and I think the reason is they both understood their agreement to be that White could haul all of the dirt. The word "guarantee" was added with pen and ink to the typewritten second supplement by Mr. Young, who had sold the equipment to White. Clearly, the only reason Mr. Young had for adding the word "guarantee" was to protect Mr. White, because the more dirt White hauled, the better chance Young had of being paid for the equipment. It is certain that Young did not add the word "guarantee" to benefit the defendant.
The majority argues its construction of the contract is supported by the fact that the second supplement designated only one pit from which dirt could be excavated. The majority states that "it appears that it was known by the parties at the time when Supplement 2 was executed that there was not sufficient fill in the new exclusively designated area to satisfy 203(5)." I do not find this statement is supported by the record. There is no evidence in this record to show how much fill was in the pit, nor does it show how much fill was ultimately excavated from this pit. Furthermore, White's agreement was to haul all the dirt needed for Item 203(5). Defendant agreed to supply the pit or pits as necessary. If this pit was not sufficient, then clearly defendant had the duty to obtain another one.
The majority further argues its construction is supported by the new agreement in the second supplement that White would receive a flat $0.915 per cubic yard. I cannot follow this argument. The reason for the increased flat rate was that the defendant changed the configuration of the pit from a simple rectangle, from which it was easy to excavate and haul. The new pit was semi-circular in shape and surrounded the residential subdivision. This made White's job much more difficult, and was the reason for the increased rate.
Finally, the majority argues that its construction of the parol evidence is supported by the fact that after the second supplement was signed the defendant put its own equipment in the pit to excavate and haul along with the plaintiff, and that plaintiff did not object to this for about two months. I see no justification for this reasoning. The plaintiff White did object, although he didn't do it formally through his attorney for about six weeks, and he finally filed this suit in which one of his principal contentions is that the defendant had no right to move into the pit and start hauling dirt for use on Item 203(5). After all, the basic agreement was that White was to haul all of the dirt needed for this item. The defendant was to furnish whatever pits were necessary to haul whatever dirt was needed for this item. It was mentioned during oral argument, although I don't believe the record contains any evidence to that effect, that in addition to the pit agreed to in the second supplement, the defendant was also hauling from another pit on adjacent land. White's basic right under the contract was not to haul dirt from a certain pit. His right under the contract was to haul all of the dirt needed for Item 203(5).
The evidence shows with sufficient certainty that, not counting approximately *695 86,000 cubic yards of fill hauled north of I10, nor about 100,000 cubic yards which was moved by defendant's scrapers, a total of 1,378,686 cubic yards of dirt were used for Item 203(5). Plaintiff actually hauled and was paid for 985,650 cubic yards. Thus, he is entitled to damages for loss of profit on the difference of 393,036 cubic yards. The record shows his loss of profit was $0.1395 per cubic yard, for a total of $54,828.52. It is my view that plaintiff is entitled to this amount in damages.
For the reasons assigned, I respectfully dissent.
NOTES
[1] The evidence shows that the primary contract estimated the excavating and hauling to consist of approximately 1,738,540 cubic yards of fill. It was estimated that there was an "underrun" of about 10%. R & G, Inc. was responsible for a "scraper item" of approximately 100,000 cu. yds. and approximately 86,000 cu. yds. of fill hauled from north of 1-10. These conclusions are not contested. Therefore, insofar as White is concerned 1,378,686 cu. yds. would be the most that he could expect to be involved with.