BIENVENU, Judge.
Plaintiff building contractor and defendant owner entered into a contract for a concrete subterranean residence house. Defendant desired to build a house into the side of a hill and engage an architect, who associated a structural engineering firm, to draft plans and specifications. On December 12, 1978, the parties entered into a contract for $57,266.00 which called for plaintiff to construct the structural portion of the residence in accordance with such plans and specifications, defendant retaining responsibility for:
“The owner shall provide excavations, access road, fill under slab, rough excavation at footings, back fill and drain system.”
The contract provided for monthly billing. Construction apparently began promptly, and the first bill presented by plaintiff was on January 3, 1979 for $12,-000.00. On January 25, 1979, defendant paid $11,400.00 of this bill. Plaintiff again *630 billed defendant on March 13, 1979 for $16,-233.00; $12,000.00 of this amount was paid on March 26, 1979. Defendant justifies the deficiencies on the basis of over-billing, which plaintiff denies. In any event, as a result of these deficiencies, plaintiff left the job, both parties employed attorneys, and an amended contract was entered into on June 25, 1979. This amended contract provided that plaintiff would submit bills to defendant’s architect, who would inspect the work for completeness, not quality, then certify it for payment to a representative of the bank where defendant had his financial arrangements, who would issue payment. $6,218.10 was paid to plaintiff concurrently with the amended contract and as provided thereby; and the next bill for $5,843.90 of August 21, 1979 was promptly certified and paid.
The evidence is vague as to the events of the next several months, but the next billing was not until March 20, 1980 for $11,-934.40 (to bring payment to $51,267.70 of the total $57,266.00 contract price, being the amount plaintiff stated to be completed as of that date). For some reason, the architect calculated the project as being complete, deducted amounts he considered necessary to correct deficiencies in waterproofing, a damaged skylight and concrete rework in the sum of $8,310.20, took into account the amount previously paid, and certified payment in the amount of $9,622.50. When plaintiff presented the certificate for payment, however, he learned that defendant had withdrawn all monies from the bank and that there accordingly were no funds available for payment. Defendant had become increasingly disenchanted with plaintiff’s performance and knew that certification and payment would be made on the basis of completion. Not being satisfied with the quality and not wanting to pay until satisfied, he intentionally withdrew the money to ensure that payment could not be made. This action was consistent with a letter he had sent plaintiff on November 28, 1979 informing him that no more money would be paid until “the house is 100% complete”.
The major problem in the Spring of 1980 was with the waterproofing, but when plaintiff submitted his final bill on April 30, 1980 for the unpaid portion of the contract price, $17,932.70 (which included amounts previously certified and unpaid), it was certified for payment by the architect on May 9, 1980. The architect had personal reservations about the quality of the waterproofing work, but since the work had been performed and the manufacturer’s representative apparently had confidence in the system as installed, he approved the bill for payment. Of course, when the certificate was presented at the bank, there were no funds available for payment.
This litigation followed shortly afterward, plaintiff seeking the unpaid portion of the contract price and some allegedly agreed upon extras, in the total amount of $20,475.09; with defendant reconvening for an even larger amount in set-offs. After trial, the presiding judge found that plaintiff was entitled to the amount sued upon, but that defendant was entitled to set-offs in an identical amount. Plaintiff appealed, complaining of the set-offs, and defendant answered the appeal, not complaining about the award to plaintiff, but contending that he was entitled to an additional $4,799.91 in set-offs.
In his reasons for judgment, the trial judge correctly stated the applicable law, as follows:
“It is an uncontroverted principle, however, that contractors are held and bound by the law to do their job in a workmanlike manner and upon failing to do so, they are responsible for the amount required to remedy the defects they create. CC-2769, Merrydale Glass Works, Inc. v. Merriam, 349 So.2d 1315 (La.App. 1st Cir., 1977).
“However, the owner cannot simply take it upon himself to refuse to pay amounts admittedly owed the contractor.”
Stated another way, when there has been substantial completion and performance of a contract, the contractor is entitled to the contract price. If there is unfinished or defective work, the owner is entitled to *631 reduce the contractor’s recovery by the amount of the cost of completion or correction. The burden of proof of substantial performance is on the contractor; the burden of proof of unfinished work or defects and the cost of completion or correction is upon the owner. Cortiza v. Rosenblat, 291 So.2d 425 (La.App. 4th Cir. 1974); Jim Walter Corporation v. Laperouse, 196 So.2d 539 (La.App. 3rd Cir. 1967); North American Contracting Corp. v. Gibson, 327 So.2d 444 (La.App. 3rd Cir. 1957).
In applying the foregoing principle, however, the trial court in his reasons for judgment did not set forth the calculations he used to arrive at a set-off figure which equals to the penny the amount he found due to the contractor. We are unable to add up any combination of set-off figures adduced by the evidence which total the amount found to be due. We accordingly have no way of knowing whether the trial judge made a proper application of the previously announced legal principle which governs this situation in resolving the issues presented. We must, therefore, resolve these issues ourselves; and we will proceed to the task by a consideration of the evidence in light of the established law.
Initially, there is no real dispute between the parties that $20,475.09 is due the plaintiff, and we agree with the trial court that the evidence supports a conclusion that the plaintiff has borne his burden of proving substantial completion and performance of the contract. The strongest evidence in this regard is a vicarious admission on the part of defendant. The architect, defendant’s agent, certified that the work was complete and authorized payment of the balance due on the contract price. Huber v. Gordy, 9 La.App. 384, 120 So. 493 (Orleans App. 1928). Defendant’s structural engineer was also of the opinion that the job was completed as per the plans and specifications. We will now consider the items of set-off claimed by defendant and see whether he has proven them and the cost of remedying them. We must do this item by item for ourselves for we have no way of knowing precisely which items were found by the trial judge to have been proven, nor the cost of remedying assigned to each one. We cannot, therefore, say with much specificity whether he erred or was correct. We will just have to reach our own conclusions, for the most part, as to whether the defendant met his burden of proof. LSA — C.C.P. art. 2164. Popich v. Fidelity and Deposit Company of Maryland, 231 So.2d 604 (La. App. 4th Cir. 1970).
The trial judge specifically found a defect in the form of wasted concrete spilled down the center of the driveway to the house all along its length. While there is no dispute that such a situation existed we must disagree that the evidence justified a finding that this condition is attributable to the plaintiff. While it is correct that a cement supplier spilled concrete as claimed while making deliveries of same to the job site for plaintiff’s use in performing his duties under the contract, still the supplier was not employed by plaintiff nor had any other connection with plaintiff. Defendant had specified which supplier to use and was paying that supplier directly, at least initially. Apparently the concrete spilled naturally as the trucks climbed the incline of the driveway. There was no other way to transport the concrete to the job site, and the construction of the driveway (or access road), which was done prior to the hauling of the concrete, was the responsibility of defendant under the contract. Any claim that defendant might have with regard to this item is against the persons responsible for the damage, not against plaintiff. This item cannot be allowed.
Defendant next complains that the floor slab is not level. The evidence is uniform that it is not. Plaintiff contends that there is no “structural” problem. While plaintiff contracted to do the structural portion of the residence, such undertaking involves more than putting everything in place. The performance must be in a workmanlike manner and in accordance with accepted building practices. Defendant’s experts, Edward C. Sewell and Marbry Jones, both building contractors, testified that the slab was not so constructed. The structural en *632 gineer, Kerry LaBauve, tended to confirm this. There is no substantial evidence to the contrary. An offset should be allowed for this item in the amount of $2,154.00, which is an average of the cost figures given by Mr. Sewell and Mr. Jones, there being no other figures available.
The next item is the washing away or deterioration of material under the porch slabs. While defendant has proven that this has occurred, he has not proven that it is the fault of plaintiff. Under the contract, defendant was responsible for the fill under the slab and for the drainage system. Defendant engaged the plumber. Mr. La-Bauve, defendant’s structural engineer, felt that this problem was logically caused by the drainage system, although the condition was naturally not in accordance with the specifications. Defendant has failed to meet his burden of proof with respect to this item.
There was evidence that steel was showing in the front sills, but if evidence was presented as to what the cost of remedying that defect is, this Court has been unable to find it. The item has not been proven.
Defendant complains of waviness, flatness, etc. on the columns, skylight and fountain. The evidence is that these conditions exist and that at least some of these areas will be exposed. Plaintiff likewise seeks to dismiss these defects as being cosmetic in nature. Plaintiff again loses sight of his obligations under the contract, and specifically the language in Section 320-3.8 of the specifications, which reads in part:
“FORMWORK: Forms shall be designed, constructed, and maintained so as to insure that after removal of forms the finished concrete members will have true surfaces free of offset, waviness or bulges and will conform accurately to the indicated shapes, dimensions, lines, elevations, and positions.”
For the cost of remedying, we will again use the average of the figures provided by Messrs. Sewell and Jones, of $2,315.00.
The most difficult item to deal with, both in terms of value and proof, is that of the waterproofing. Plaintiff submitted a sample of the material he proposed to use, Melnar, to the architect who passed it on to Mr. LaBauve, and it was found to be acceptable. It should be noted here that no one involved in this matter, with the possible exception of Hal Robinson, the manufacturer’s representative, knows much about waterproofing, especially for subterranean residences. The specifications at Section 342-2.3 call for the owner to provide supervision by the manufacturer’s representative for the first 25% of the waterproofing installation. This was not done. Section 342-1.2 provides that the waterproofing work shall be performed by experienced workmen who are regularly engaged in that type of work. Plaintiff failed to do this, even though this was the first subterranean building he had ever constructed. When plaintiff submitted his bill of March 20, 1980, the architect, George Minturn, discovered when he went to the construction site to inspect prior to making his certification, what he correctly considered to be a problem with the waterproofing in that it was not adhering to the surface and leaked. He declined to certify payment attributable to the waterproofing, instructed plaintiff to go no further for the time being and arranged for Mr. LaBauve and Mr. Robinson to meet with he and plaintiff at the job site. Mr. Robinson found deficiencies, notably that a roofing mastic had been used to accomplish the adhering after plaintiff had used up all the primer he had on hand. There was other non-compliance with the manufacturer’s brochure instructions. Mr. Robinson gave plaintiff instructions on how to correct the improprieties, and on his next visit Mr. Robinson was satisfied that plaintiff had done so except in several very minor particulars which he pointed out to plaintiff, and which plaintiff insists he then corrected. Robinson then made it absolutely clear that in a “below grade” installation such as this, that it was vital that backfilling be done immediately to ensure the application of the pressure necessary to ensure the permanence of the adherence and the avoidance of leaks. Although Mr. Robinson apparent *633 ly lacked sufficient conviction to reduce any assurances to writing as requested of him by Mr. Minturn, the architect nevertheless made the recommendations known to defendant, whose responsibility it was to backfill. . Plaintiff’s attorney twice informed defendant in writing of the recommendation for immediate backfilling. Defendant was understandably reluctant to backfill without a bond or a guarantee, being concerned that if the waterproofing installation was defective, the job and expense of remedying the situation would be greatly magnified after backfilling. The contract did not require plaintiff to furnish a bond or a guarantee. Mr. Minturn had advised defendant to have a waterproofing expert inspect the installation immediately, if he wanted to, because of the need to backfill. Defendant did not secure such an expert, saying he was unable to, and in fact did not have one to testify at the trial. As of the date of trial, the backfill had still not been accomplished, and at that time the waterproofing was indeed defective. The question is why? Improper installation or failure to backfill? Defendant’s experts, Sewell and Jones, both point to defects, but they first observed the installation only a short time before trial and after the effect of the lack of backfilling was present, and they both admit they know very little about this kind of waterproofing. They provided the only figures presented on the cost of remedying the situation, but again admit that they cannot positively state that the remedying must be done, and they merely obtained prices from outside sources, not as a result of their own independent knowledge of what needed to be done. Mr. Min-ium found the installation to be in the same essential condition at the time of trial as when he first observed it in March of 1980. Of course, he admittedly is not very conversant with waterproofing, and it is not known what corrective effect the backfill would have had. Mr. Robinson certainly feels, though with how strong a conviction is questionable, that the backfilling would have had a corrective effect; and he feels the reason for the present condition of the waterproofing is the failure to have timely backfilled. Defendant has the burden of proof and by his own admission no expert testified that there was anything wrong with the waterproofing.
This court understands defendant’s fears and appreciates his reasons for not backfill-ing. His failure to do so, however, has worked against him in meeting his burden of proof. We are unable to conclude from the evidence that the waterproofing installation was defective.
Lastly, defendant claims that the roof is not level. Mr. Jones so testified and it was not contradicted. The fear is that if the roof is not levelled, water seeping through the overlaid soil could collect and perhaps leak through the roof if the waterproofing is defective. On the other hand, the roof has no slope (it was designed that way), so it can be argued that water would collect and stand in any event. Mr. LaBauve testified there was no structural problem, and cosmetically there would be no problem as the roof is designed to be covered with dirt. The threat of leakage due to defective waterproofing is speculative. Defendant has failed to meet his burden of proof with respect to this item.
In summary, we find that plaintiff, J. B. Boydstun, Jr., is entitled to Judgment on the principal demand in the amount of $20,-475.09; and that defendant, Charles “Pat” Johnson, is entitled to Judgment on his reconventional demand for set-offs in the amount of $4,469.00. Having come to those conclusions, we hold that the amount due Boydstun by Johnson on the contract sued on is the reduced amount of $16,006.09.
For the reasons assigned, the judgment of the trial court in favor of Charles “Pat” Johnson in the amount of $20,475.09 is amended to the reduced amount of $4,469.00; in all other respects, the judgment is affirmed.
This court feels that the cost of this appeal should be shared equally between the parties.
AFFIRMED IN PART, AMENDED IN PART, AND RENDERED.