STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-654

MILAN GALA

VERSUS

MARK HARRIS

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20085062
HONORABLE JULES DAVIS EDWARDS, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Oswald A. Decuir, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

REVERSED IN PART AND RENDERED; AFFIRMED IN PART.

John H. Weinstein
Thomas E. St. Germain
Weinstein & St. Germain, L.L.C.
1414 N.E. Evangeline Thruway
Lafayette, LA 70501
(337) 235-4001
Counsel for Defendant/Appellee:
Mark Harris

Luke Edwards
1313 Lafayette St.
P. O. Box 3483
Lafayette, LA 70502
(337) 233-9995
Counsel for Plaintiff/Appellant:
Milan Gala

**GREMILLION, Judge.**

The plaintiff, Milan Gala, d/b/a Acadiana A-1 Fence Company, appeals the judgment in favor of the defendant, Mark Harris. For the following reasons, we reverse in part and render and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2008, Gala filed a petition for sums due on an open account against Harris. Gala alleged that Harris owed him $20,000.00 for a fence he partially built for Harris and his wife at their Youngsville, Louisiana home. A contract dated August 12, 2005 obligated Gala to construct a fence around the Harris home for $43,432.86. Harris paid Gala $27,650.00 as a down payment with the balance to be paid upon completion. Work on the fence began in August 2005 but was interrupted by Hurricanes Katrina and Rita. The Harrises claim that Gala never returned to finish the job, while Gala claims that he was prevented from finishing the job.

Following a one-day trial in November 2010, the trial court found a contract existed between the parties, but that the $15,782.86 balance was not due since Gala failed to complete the fence, and the contract was for the sale of a future thing that never came into existence. The trial court further found that there was never a meeting of the minds regarding certain modifications of the fence. Thus, the trial court found the contract was not modified. The trial court further found that Gala only partially performed and failed to prove that the Harrises prevented him from completing performance.

Gala filed a Motion for New Trial and to Hold in Contempt and/or Annul Judgment. The trial court denied the motions for new trial, to hold the Harrises in contempt for perjury, and to annul the judgment. Gala now appeals.[1]

---

[1] Gala filed a supervisory writ with this court which was denied because the judgment on the merits was a final, appealable judgment.

**ASSIGNMENTS OF ERROR**

Gala assigns as error:

1. The trial court's failure to award damages to him pursuant to substantial performance or quantum meruit.

2. The trial court's denial of his Motion for New Trial and To Hold In Contempt and/or To Annul Judgment.

**SUBSTANTIAL PERFORMANCE/QUANTUM MERUIT**

Gala does not dispute the trial court's finding that the instant matter was not an open account, but instead arose in contract. The trial court based its ruling on La.Civ. Code art. 2450, which states:

> A future thing may be the object of a contract of sale. In such a case the coming into existence of the thing is a condition that suspends the effects of the sale. A party who, through his fault, prevents the coming into existence of the thing is liable for damages.

The trial court stated:

> The contract was for the sale of [sic] future thing. The future thing was the fabrication and installation of a fence. The plaintiff provided partial performance; but, the performance was not competed. Final payment for the future thing was due upon completion. Since the future thing was never completed the $15,782.86 has not come due. Plaintiff has failed to prove that the defendants prevented the plaintiff's performance during the period August through December 2005.

We find the trial court legally erred in finding that the contract was for the sale of a future thing. A future thing is a thing that has yet to come into existence, such as a sale of a future crop or an unborn animal. *See Frey v. Amoco Prod. Co.,* 603 So.2d 166 (La.1992). A nearly 90% completed fence is not a future thing. We perform a de novo review of the record and render a judgment on the merits when the trial court legally errs by applying the wrong legal standard. *Lasha v. Olin,* 625 So.2d 1002 (La. 1993).

*Substantial Performance*

2

Gala argues that of an approximately 1300 foot fence, the portion that he did not complete was roughly a 120 foot section that included a metal frame gate. Gala claims that he made repeated attempts to complete the project, but was prevented from doing so by the Harrises. Thus, he argues that he was entitled to recover the contract price because the job was substantially completed. Gala argues that even if the contract had not been substantially completed, the trial court was required to make an award based on quantum meruit. We agree.

In disputes involving construction contracts, whether the contractor has substantially performed determines whether he will recover the full contract price. *Ortego v. Dupont*, 611 So.2d 792 (La.App. 3 Cir. 1992). Whether a contractor has substantially performed under the contract is a question of fact. *Id*. Factors to consider in determining whether substantial performance exists are "the utility to the owner of the work performed, the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, and the ease of correction." *Walter Lafargue Real Estate, Inc., v. Raines,* 420 So.2d 1309, 1311 (La.App. 3 Cir. 1982). If the contractor has not substantially performed under the contract, i.e. there is unfinished work, the contractor is limited to recovery in quantum meruit, and his recovery will be reduced by the amounts the owner must expend to complete the project. *Id.* "The burden of proof of unfinished work or defects and the cost of completion or correction is upon the owner." *Boydstun v. Johnston*, 401 So.2d 629, 631 (La.App. 3 Cir.), *writ denied,* 404 So.2d 1262 (La.1981).

At the conclusion of the trial, the trial court rendered oral reasons for judgment and stated:

> Completion has not yet occurred, and the plaintiff has not proven one way or the – I'm not able to determine one way or the other whether the defendants prevented the plaintiff from performing during the period of August and December, or whether or not the defendant simply chose – I'm sorry, plaintiffs simply chose to not perform during that time period.

But ultimately, on the 13th of December, plaintiff notified defendant that he was dissolving the contract as a result of failing to perform, and four months of non performance is sufficient to allow the plaintiff to conclude that performance would not occur within a reasonable period of time.

. . . .

MR. EDWARDS: Your Honor, are you making any specific finding regarding substantial completion?

THE COURT: No, I did not.

The trial court did not make any factual findings regarding the central issues in this case upon which we could rely. In performing our de novo review of the record, the following testimonial evidence was considered. Gala testified that he had been in the fencing business for ten years. He described going out to the Harris property and offering a written proposal, which was submitted into evidence. The proposal lists 658 feet of cedar fence with cedar capping, 655 feet of black aluminum fencing, and several gates, for a total price of $43,432.86. It further shows payments to be made of a $27,650.00 deposit with $15,782.86 due upon completion. Gala testified the down payment was for materials. Gala stated that approximately two weeks after the proposal the materials had arrived and he and Jake Fruge began working on the fence, first setting up fence posts. Gala testified, though, that the Harrises requested a change, which resulted in the removal of the posts to the right of the house which had originally been set up for wood fencing. Gala said the Harrises decided to change to aluminum fencing. Gala said that 320 feet of wood fencing was replaced with the black aluminum fencing. Gala testified that the aluminum fencing is much more expensive than cedar fencing and would result in a price change. Additionally, he testified that the Harrises added some fencing around pool pumps that was not included in the original proposal that added $2,400.00. He said the new total was $50,757.00 with these changes.

Gala further testified that Mr. Harris requested that he delay in continuing the fence because the Harrises were having work done on their property, including

4

the installation of a pool, tennis courts, and a pond and they did not want the fence to interfere with the work being done. He testified that he installed all but 120 feet of the fence. He knew it was exactly 120 feet because all of the sections were between brick columns that had been installed prior to the fence and each section measured 160 feet. Gala said he had installed five eight-foot panels, leaving 120 feet of fencing to be installed. He further testified that he was unable to install the metal frame gate that amounted to ten feet of fencing. Gala said that he and his crew would have completed the remaining fence work in about six hours.

Gala said that he called the Harrises 37 times between August 2005 and January 6, 2006, submitting his cellular phone bill into evidence. He said that Mr. Harris would occasionally call back and inform him that the pool or pond was not finished. Gala said that from January 6 through March 9, Mr. Harris called twice claiming that the pool or pond had not yet been completed. From January 6 through November 2009, Gala called the Harrises 15 times and received two return calls. He said that the last return call he received from Mr. Harris was on March 9, 2006.

Gala testified regarding some photos he took of the property and stated that he left the materials to finish the fence at the property and that someone else used them to finish the 120 foot section. He pointed out differences between his installation and the installation of the 120 foot section completed by someone else. Photographs admitted into evidence indicate a clear difference in Gala's workmanship and that of the crew hired to complete the fence.

On cross-examination, Gala denied delaying completion of the Harris's fence in order to pursue more profitable work that followed the hurricanes. He stated that the hurricanes had nothing to do with his not finishing the fence; instead testifying that the Harrises would not allow him to return to finish the work.

Fruge testified that he was Gala's half-brother and that he worked for Gala at the time and had installed the fence posts that later had to be removed due to the change. He said that all but 120 feet of the fence had been installed. Fruge testified it would not have taken more than a day to finish the fence. He said that Gala told him he was waiting on the homeowners to allow him to come and finish the fence.

James Rodriguez testified that he was employed by Mr. Harris's hospital management company and finished the fence at Mr. Harris's request in November 2007, some two years after it began. He testified that it took about two weeks to finish and repair damaged parts of the fence. Rodriguez hired men out of Houston to complete the fence. He testified the total for the material and rental equipment, salary, and purchase of an electric fence was $17,247.00. Rodriguez said that he did not install the electric fence that cost $2,500.00 but it was included on the expense sheet because Mr. Harris had to spend that to keep his dogs enclosed. Rodriguez believed the electronic fence was installed sometime in 2005. He further stated this was the first time he had ever installed an aluminum fence. He testified that he had to install 160 feet of the aluminum fencing from one brick column section to another and install about 60 fence caps. He said it took three laborers two weeks to complete the work. He admitted it probably took his crew longer than it would have taken an experienced crew. The expenses for the crew included a hotel stay and food.

Mr. Harris testified that he had recently been married over the summer of 2005. He said his wife had large dogs and he wanted the fence to enclose the property for the dogs. He stated that he thought the fence would be completed in two to three weeks. He testified that the "majority of [the fence] was done" before Hurricane Katrina made landfall on August 29, 2005. He admitted that following Hurricane Katrina no work could be done due to the yard being a mess. He stated that he called Gala in September and October to inquire as to when he would be

6

coming to finish the fence. Harris said the electronic fence for the dogs was installed in October or November. He stated that he got the electronic fence because Gala did not come back and finish the job. Mr. Harris testified that one 160 foot section had not been completed and another had to be repaired.

Mr. Harris testified that on December 13, 2005 his wife called Gala. He said that his wife was "shaking" and "scared" following the conversation and, at that point, he decided he was finished working with Gala. He said that he told Gala later that day via telephone conversation not to return to his house.

Mr. Harris admitted that he did not call in Rodriguez to finish the fence until some twenty months later. He said that the invisible electronic fence was containing the dogs and there were several other projects going on, including pool and the pond. However, he denied telling Gala not to return due to the building of the pool and pond prior to the December 13 conversation. He stated that he told Gala not to return because he was rude to his wife.

Mr. Harris testified that "[Gala] and my wife had talked about different things after we started this about what we might do, and then in the end, after he finished the initial part of it we called him back we just said, forget anything else, just do what we agreed to do." He denied agreeing to any changes. However, he later testified when questioned about the changes that "My wife did a lot of changes." He appeared to agree that the original proposal included more wood fencing that was later changed to aluminum.

Mr. Harris had little knowledge of what made up the $17,247.00 costs of the 160 foot section that Rodriquez completed in 2007.

Mrs. Harris testified that following their July wedding, she moved into the home Mr. Harris owned and wanted to bring her two large dogs. She stated that she wanted the fencing to keep the dogs from getting out of the ten-acre yard. She said that Gala told them the fence would be complete in two to three weeks once

the materials arrived.  Mrs. Harris said that, although she discussed changes with Gala, they were never finalized and she never agreed to move forward with any changes to the original proposal.

Following Hurricane Katrina, Mrs. Harris testified that Gala would have been unable to complete the project for at least a week due to storm damage.  She said that she spoke with Gala in October, at which time he informed her that he was going to do "hurricane work."  She said she asked him when he was going to finish the fence at her house.

Mrs. Harris testified that at the time of the December 13 phone call Gala asked her if they would be willing to pay him $10,000.00 since he had completed more than fifty percent of the work. She said that he "got a little nasty" and hung up on her.  Mrs. Harris testified that the invisible fence was installed because they needed a quick way to contain the dogs since there were not many people doing fence work in the area following the hurricanes.

On cross-examination regarding modification of the original contract, Mrs. Harris testified:

> Q.    Were you aware of a change being made where there was less wood and more aluminum?"
>
> . . . .
>
> A     Oh. Well, yes, we had talked about changing it because of the hurricane winds, but we never got another bid.  We never – can tell you we discussed it, yes, we did.
>
> Q     Q. I'm going to read. "I'm just trying to exclude any information.  You do recall that some portion of one side was initially going to be wood?" and what was your response?
>
> A     "Yes."
>
> Q     "And it was changed to aluminum?"  What was your response? And read the whole response there.
>
> A.     "Yes, because of the hurricane winds that we got out there, we did – we did decide to change it."

8

Q. Now. On May 6, '09, you testified that you did, in fact change to less wood and more aluminum, but today you testified that you didn't make that change. Now, which is it?

A. No, I didn't say. I said that we had discussed it, but we never – we never sat down, never discussed price. We never – yes, we did discuss it because of the hurricane winds.

Based on our review of the evidence, we find that Gala was prevented from completing the fence. It is unreasonable to conclude that Gala would forfeit more than $15,000.00 in labor costs for what amounted to a day's work. Moreover, the evidence in the record indicates that Gala made repeated attempts to finish the fence, but due to a personality conflict between him and Mrs. Harris, he was told not to return. While most claims involving substantial performance involve a claim by the homeowner that the contractor's work was defective, there is no such claim here. Nevertheless, due to the Harrises' breach, the work was incomplete, and therefore, substantial performance could not occur. Even if we accept as true that Gala was the party who breached the contract, he would still be entitled to recover in quantum meruit.

We further find that Gala proved that the contract was modified from the original agreement to include the installation of more aluminum and less wood, plus the addition of fencing around the pool pumps. We accept Gala's figure of $50,757.00 as the total price for the job including labor and materials. While we find that the Harrises are due an offset for the costs to finish the fence, we find the figures they presented are unreasonable. It is unreasonable to give an offset of $132.67 per foot ($17,247.00 divided by 130 feet of unfinished fencing). Instead, a reasonable calculation is to determine the per-foot price of the fence based on the length of fencing and the total contract price. The total footage of the fence was 1,325 feet, with a total price of $50,757.00 which equals $38.31 per foot. We find that 130 feet of fencing was not completed, thus $38.31 multiplied by 130 feet

9

equals $4,980.30 that the Harrises are entitled to as an offset of the amount owed to Gala.[2] The Harrises made an initial down payment of $27,650.00. The down payment plus the offset equals $32,630.30. The total contract price of $50,757.00 minus $32,630.30 equals $18,126.70 owed to Gala.

## NEW TRIAL

In this assignment of error, Gala argues that his motion for new trial should have been granted because the judgment is clearly contrary to law and because, pursuant to La.Code Civ.P. art. 1972, he discovered new evidence following the trial; namely, the contract evidencing various modifications that the Harrises denied ever making.[3] [4] Gala claims that after the day of the trial, he called his mother to inform her of the day's events, at which time she advised him that she may have the document. A late-night search by the mother revealed the modified contract. Gala argues he did not attempt to locate the contract before because a) he assumed it had been lost in the normal course of business, and b) the Harrises never denied the modification contract prior to the trial, and he did not believe its existence was an issue. Gala claims that it was only at trial that Gala learned that the Harrises would deny that they ever agreed to a modification.

We find no error in the trial court's denial of Gala's motion for new trial. Simply, Gala should have discovered the modified contract prior to trial. The terms of the contracts including written modifications were central issues before the court. The late-found modified contract is highly probative of exactly what occurred between the parties, the timing issues that existed at the trial, and

---

[2] We note that the Harrises may have been due a credit for a second payment of $7,600.00 which Gala admits to in his brief. However, no evidence regarding this payment was presented at trial by any party. In fact, the $7,600.00 payment was not even referenced at trial by any party and the Harrises never claimed a credit for it.

[3] We need not address Gala's claim that a new trial should be granted pursuant to La.Code Civ.P. art. 1972 (A) as we have found the trial court committed a legal error necessitating a de novo review of the record.

[4] Louisiana Code of Civil Procedure Article 1972 (2) provides that:
    A new trial shall be granted, upon contradictory motion of any party, in the following cases:
    (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

credibility issues. A person exercising due diligence should have located this essential contract prior to the start of trial. Accordingly, this assignment of error is without merit.

*Contempt*

In this assignment of error, Gala argues the Harrises should be held in contempt pursuant to La.Code Civ.P. art. 224 (4) and (10) for lying and perjuring themselves. This claim is based on admission of the late-found modified contract. Because we have found that the modified contract was properly excluded, Gala's contempt claims must also fail. Accordingly, this assignment of error is without merit.

*Annulment*

Gala argues the judgment was obtained by fraud and ill practices and should, therefore, be annulled pursuant to La.Code Civ.P. art. 2004. Again, this argument is based on the modified contract being admitted into evidence. Thus, there is no error in the trial court's denial of the motion to annul judgment.

## CONCLUSION

The judgment of the trial court is reversed insofar as it finds that this was a contract for a future thing that never came into existence. Judgment is rendered in favor of the plaintiff/appellant, Milan Gala, in the amount of $18,126.70. The trial court's denial of Gala's motions for new trial, contempt, or annulment is affirmed. All costs of this appeal are assessed against the defendant-appellee, Mark Harris.

**REVERSED IN PART AND RENDERED; AFFIRMED IN PART.**

11